993 A.2d 845 (2010)
413 N.J. Super. 135
TOO MUCH MEDIA, LLC, John Albright and Charles Berrebbi, Plaintiffs-Respondents,
v.
Shellee HALE, Defendant-Appellant.
No. A-0964-09T3
Superior Court of New Jersey, Appellate Division.
Argued March 2, 2010.
Decided April 22, 2010.
*848 Jeffrey M. Pollock, Lawrenceville, argued the cause for appellant (Fox Rothschild, attorneys; Mr. Pollock, of counsel; Mr. Pollock, Barry J. Muller, and Joseph Schramm, III, on the brief).
Joel N. Kreizman, Ocean, argued the cause for respondents (Evans, Osborne and Kreizman, attorneys; Mr. Kreizman, of counsel and on the brief).
McCusker, Anselmi, Rosen & Carvelli, Florham Park, attorneys for amici curiae North Jersey Media Group, Inc., the New Jersey Press Association, NBC Universal, Inc. and The New York Times Company (Jennifer A. Borg and Thomas Cafferty, of counsel; Bruce S. Rosen, on the brief).
Before Judges CARCHMAN, PARRILLO, and LIHOTZ.
The opinion of the court was delivered by
PARRILLO, J.A.D.
We granted leave to appeal to decide whether the protections of New Jersey's Shield Law, N.J.S.A. 2A:84A-21, extend to an operator of a website so as to bar from disclosure sources from which she obtained information in her investigation of the online adult entertainment industry and later posted on internet bulletin boards.
Plaintiff Too Much Media, Inc. (TMM), owned by plaintiffs John Albright and Charles Berrebbi, is a software company in Freehold that manufactures, as its principal product, NATS, a prepackaged *849 "affiliate" or tracking software. Different websites, affiliated with one another for common business purposes, place links and banners on each other's websites as a form of reciprocal advertising, and when a banner or link is "checked," the user is transferred to the affiliate site. NATS functioned as the financial intermediary between these affiliated websites, allowing website owners to track which other "affiliate" websites were sending customers to them and thereby determine what commissions were due to the referring website. NATS did not collect money from the usersit simply provided a means of tracking sales and commissions due. TMM made its profit by selling the software and charging a licensing fee. Many of TMM's customers who are "affiliates" to each other are in the "adult entertainment" business.
In Fall 2007, TMM experienced a security breach in which hackers compromised non-unique user names and passwords maintained in the NATS database for TMM clients and accessed subscriber lists to various porn websites and customer e-mail addresses. Obviously, such a security breach is damaging to a website's business and, due to the supposedly private nature of online pornography viewing, especially embarrassing for the customers of the website. This breach created a substantial amount of conversation within the online porn industry and was reported by major news agencies as early as January 2008.
Defendant Shellee Hale, a Washington State resident who worked for Microsoft and then operated a computer consulting company until 1994, began a business in 2007 as a certified life coach. In connection with that business, defendant operated two websites. Via these websites, users, without leaving their computers, were able to utilize webcams to project real-time images of themselves to another viewing a computer screen and thus interact electronically face-to-face over long distances. At some point in this business venture, defendant became distraught over the number of instances in which she was subjected to "cyber-flashers" who exposed themselves naked to her through the camera, under the guise of seeking life-skills coaching. When defendant's server did not remedy her complaints, she was determined to investigate what she perceived to be criminal activity in the online adult entertainment industry.
In October 2007, defendant launched a website called "Pornafia," www.pornafia. com, purportedly "to inform the public on scams, fraud, [and] technological issues" in the adult entertainment industry. According to a press release posted on February 8, 2008:
[Pornafia] came about in reaction to the unprecedented levels of criminal activity now rampant within the global adult entertainment industry, which have until now gone largely unchecked, with the aim of providing a cost free information resource for victims, potential victims, legitimate industry players, and pertinent government agencies worldwide.
Defendant further specified the crimes as "credit card fraud, identity theft, affiliate fraud and PPC fraud." She identified the Pornafia website as an "information exchange," and later described it alternatively as a "bulletin board" or "message board."
Despite defendant's announcement, however, the website was never fully launched and therefore published no findings. Although defendant said that the "front end of [the website] was a news magazine," she did not identify any journalist hired, and admitted that "that portion of the site was still being worked on and was not live."
Defendant claims, nevertheless, to have pursued an investigation of the online *850 adult entertainment industry. To this end, she formed a limited liability company, ES Enterprises, under which she created two webcam sites, "sexyteaser.com" and "sextyteaserguys.com," to interact on various adult industry websites and to "start to develop relationships, and get into this business under somewhat of a pretext." Defendant first discussed these websites with the Attorney General of Washington, "[b]ecause I wanted to make sure that they were aware of what I was ... going to be doing."
Defendant also reviewed web pages of the porn industry and news media sites, interviewed persons in the industry and attended six industry trade shows. One of the primary means she utilized for collecting and communicating information was through porn industry weblogs (blogs) and message boards such as www.jbm.com, www.gfy.com and www.Oprano.com (Oprano), the self described "Wall Street Journal for the online adult entertainment industry." These are forums where members, in order to facilitate discussion, read and post their thoughts and opinions on various subjects. The content is usually available to the public for viewing. In order to post on the board, however, one must become a registered user by submitting an online form, including a name, e-mail address and a chosen username. Once approved by a website administrator, a user is free to post on the board; such posts are unfiltered and, ordinarily, not subject to review by the site administrator prior to being posted.
Defendant's investigation ultimately focused on TMM. To that end, she reviewed numerous posts and online articles related to the 2007 security breach of TMM's NATS database. Defendant also examined pleadings from an open litigation[1] in which TMM's prime competitor, NR Media, sued TMM for defamation and tortious interference, among other claims, over comments by TMM that NR Media had not properly paid its affiliates. Defendant supposedly also talked to a person who told her confidentially that Albright had "threatened their life."
On several occasions, defendant made numerous posts on Oprano about TMM. For example, on March 17, 2008, defendant posted:
Consumer's [sic] personal information is fair game to every thief online[.] Read the 2much media Nats depositions (not yet public but copies are out there Charles and John may threaten your life if you report any of the specifics which makes me wonder)[.]
She then directed the reader by link to Pornafia, where the complaint in a class action lawsuit against TMM could be accessed.[2] She concluded this post by intimating plaintiffs have engaged in fraudulent, unethical and illegal uses of technology, stating if one read the class action suit "you would understand the depths of the schemes and fraud and how the unethical and illegal use of technology has become common practice." Defendant also posted a "snipit" [sic] from the class action complaint, listing each of the allegations against TMM by NR Media, including a violation of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 to -106, *851 and New Jersey's Identity Theft Protection Act, N.J.S.A. 56:8-161 to -167.
In another post on Oprano, defendant suggested plaintiffs engaged in threatening behavior against persons who released information about the NR Media/TMM lawsuit:
Let me just clarify that this is my personal opinion after reading and speaking with several people.
Mr. John Albright has personally contacted me to let me know he "has not threatened anyone[,]" but I was told something different from someone who claims differently and a reliable source.
In yet another posting on Oprano, defendant implied TMM purposely failed to inform its customers of the security breach and actually made a profit off of it:
I guess I should preface this with innocent until proven guilty but....
This point really concerned me. I believe it is $10,000 per violation in New Jersey. Does anyone have any idea how many consumer's [sic] processed their information through NATS. If 2 Much Media actually was aware of a security leak between them and the Billing Company why didn't anyone put out a fraud security announcement to the consumers? If this is trueHow long have they been sitting on this information and doing nothing?
On another Oprano posting, defendant alleged plaintiffs had used TMM's NATS software to cause an influx of spam to its customers and "re-directs" away from NAT's affiliate websites to websites owned by TMM or one of its employees:
Do you think there is traceable revenue on the stolen email addresses from the security leak?
Do you think that we will find that traffic, spam, re-directs are found on a[n] adult site owned or operated by a TMM owner/employee?
Is there a potential class action law suit by customers who's [sic] email addresses were compromised and were not informed of this theft as soon as TMM became aware of it?
How many customers had [an] increase of spam or malware after signing up under a site managed by TMM and is there some relevancy connecting the two?
Defendant explained that in this post, she was questioning whether TMM sold the email addresses, "and then they spammed those e-mail addresses, or used those e-mail addresses to send material to promote a product, or services ... the[n] people ... bought something that would be revenue from the stolen e-mail addresses." Defendant acknowledged that throughout her "investigation," she never inquired of TMM's principals concerning their version of the facts.
According to defendant, she posted information on TMM's security breach for two reasons: (1) to inform the public about alleged misuse of technology, affiliate fraud and scams taking place in the online porn industry; and (2) to facilitate debate on these issues. She believed the information was of interest to the public because "whenever there is a security breach ... people may need to change their passwords,... change their banks, [or] close accounts [because] ... their personal information can be compromised."
These various internet postings form the basis of plaintiffs' complaint against defendant, alleging defamation, false light and trade libel. After defendant answered,[3] *852 discovery ensued in which plaintiffs sought to depose defendant about, among other things, the sources of information for the allegedly defamatory statements she posted about them. Claiming to be a journalist and invoking the newsperson's privilege, N.J.S.A. 2A:84A-21, defendant sought a protective order preventing disclosure of the identity of her "confidential" sources. Following a plenary hearing pursuant to N.J.S.A. 2A:84A-21.3, the motion judge denied the application for a protective order, determining that defendant was not entitled to the protections of the Shield Law. Defendant's subsequent motion for reconsideration was also rejected.[4] On leave granted, defendant appeals, arguing that both the statutory newsperson's privilege and First Amendment of the United States Constitution protect the anonymity of her sources, and that the motion judge erred in finding she was not a member of the news media and her information was not "newsworthy."

I

(i)
N.J.S.A. 2A:84A-21[5], entitled "Newsperson's privilege" and commonly called the "Shield Law," states:
Subject to [N.J.R.E. 530], a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding....
a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated....
"News media" is defined as "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." N.J.S.A. 2A:84A-21a(a). "News" is defined as "any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect." N.J.S.A. 2A:84A-21a(b).
The Supreme Court has recognized the Legislature's "intent to preserve a far-reaching newsperson's privilege in this State[,]" Maressa v. New Jersey Monthly, 89 N.J. 176, 187, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982), and that the privilege was intended "to be as broad as possible." State v. Boiardo, 82 N.J. 446, 457, 414 A.2d 14 (1980). The Shield Law "affords newspersons an absolute privilege not to disclose confidential sources and editorial processes, absent any conflicting constitutional right." Maressa, supra, 89 N.J. at 189, 445 A.2d 376. It was enacted "to protect the confidential sources of the press as well as information so obtained by *853 reporters and other news media representatives to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey." In re Farber, 78 N.J. 259, 270, 394 A.2d 330, cert. denied sub nom., New York Times Co. v. New Jersey, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).
The mere claim that one is a reporter or journalist, however, is not enough to gain the protection of the Shield Law. As with any assertion of privilege, the proponent bears the burden to prove its application to any given situation. Horon Holding Corp. v. McKenzie, 341 N.J.Super. 117, 125, 775 A.2d 111 (App. Div.2001). In the context of resolving conflicts between a criminal defendant and a newsperson he wants to subpoena in his defense, the Legislature, in 1979, enacted a comprehensive scheme requiring the proponent to first make a prima facie showing of his or her entitlement to the privilege before the State is required to establish countervailing considerations. N.J.S.A. 2A:84A-21.3. Thus, N.J.S.A. 2A:84A-21.3[6] provides:
a. To sustain a claim of the newsperson's privilege under [N.J.R.E. 508] the claimant shall make a prima facie showing that he is engaged in, connected with, or employed by a news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered... and that the subpoenaed materials were obtained in the course of pursuing his professional activities.
b. To overcome a finding by the court that the claimant has made a prima facie showing under a. above, the party seeking enforcement of the subpoena shall show by clear and convincing evidence that the privilege has been waived under [N.J.R.E. 530] or by a preponderance of the evidence that there is a reasonable probability that the subpoenaed materials are relevant, material and necessary to the defense, that they could not be secured from any less intrusive source, that the value of the material sought as it bears upon the issue of guilt or innocence outweighs the privilege against disclosure, and that the request is not overbroad, oppressive, or unreasonably burdensome which may be overcome by evidence that all or part of the information sought is irrelevant, immaterial, unnecessary to the defense, or that it can be secured from another source. Publication shall constitute a waiver only as to the specific materials published.
c. The determinations to be made by the court pursuant to this section shall be made only after a hearing in which the party claiming the privilege and the party seeking enforcement of the subpoena shall have a full opportunity to present evidence and argument with respect to each of the materials or items sought to be subpoenaed.
Although the statutory procedure detailed in paragraph (b) is specific to requests by criminal defendants, In re Schuman, 114 N.J. 14, 27, 552 A.2d 602 (1989), we discern no reason not to apply the more traditional rules embodied in paragraphs (a) and (c) to determine the applicability of the evidentiary privilege in a civil context. Where the existence of a privilege is subject to a condition, the issue is to be determined by the judge, N.J.R.E. 104(a); In re Madden, 151 F.3d 125, 127-28 (3d Cir.1998), and where there are contested issues of material fact as to the existence of the conditions precedent to assertion of the privilege, there should be a full preliminary hearing to decide whether *854 all the requirements of the Shield Law have been met. N.J.R.E. 104(a); Jerolamon v. Fairleigh Dickinson Univ., 199 N.J.Super. 179, 185, 488 A.2d 1064 (App. Div.1985); Devlin v. Greiner, 147 N.J.Super. 446, 460, 371 A.2d 380 (Law Div.1977). Cf. R. 1:6-6; Conforti v. Guliadis, 245 N.J.Super. 561, 565, 586 A.2d 318 (App. Div.1991), modified, 128 N.J. 318, 608 A.2d 225 (1992). Here, a finding that defendant was connected with the "news media" and, in the course of her professional duties, was involved in some aspect of the news process for the general public is essential to the successful invocation of the newsperson's privilege under N.J.S.A. 2A:84A-21.

(ii)
Even in the context of traditional forms of news media, determining who qualifies for the privilege is difficult. The United States Supreme Court has warned of the complexities in such an undertaking:
Sooner or later, it [will become] necessary to define those categories of newsmen who qualif[y] for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer... just as much as of the large, metropolitan publisher....
[Branzburg v. Hayes, 408 U.S. 665, 704, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626, 653 (1972).]
Since then, few cases around the country have discussed who, beyond the traditional news media, has status to raise the newsperson's privilege. Our research discloses only limited occasions in New Jersey where the privilege had been successfully invoked by an individual who was not a "journalist" in the traditional sense. This court in In re Avila, found that, although a twenty-page tabloid paper printed in Spanish was not a "newspaper" within the meaning of New Jersey's Shield Law because, among other reasons, it did not have a paid circulation, it nonetheless satisfied the statute's requirement of being sufficiently "`similar' to a `newspaper.'" 206 N.J.Super. 61, 63-66, 501 A.2d 1018 (App.Div.1985). In In re Woodhaven Lumber & Mill Work, the Court extended Shield Law coverage to unpublished photographs of a fire taken by a news photographer. 123 N.J. 481, 497-98, 589 A.2d 135 (1991). In In re Burnett, the Law Division applied the Shield Law to information used in preparation of an annual insurance rating report issued by an industry trade publication. 269 N.J.Super. 493, 500-02, 635 A.2d 1019 (Law Div.1993). In Kinsella v. Welch, in connection with a patient's invasion of privacy action, we applied the newsperson's privilege to a media company videotaping events in a hospital emergency room for a reality television program. 362 N.J.Super. 143, 154-55, 827 A.2d 325 (App. Div.2003). More recently, in Trump v. O'Brien, we found the author and publisher of a biographical book about an entrepreneur was protected under both New York's and New Jersey's Shield Law. 403 N.J.Super. 281, 292-98, 303-04, 958 A.2d 85 (App.Div.2008).
The Court of Appeals for the Second Circuit was the first to fashion a test for invoking a journalistic privilege under the qualified First Amendment right recognized in Branzburg, emphasizing the intent behind the news-gathering process rather than the mode of dissemination. von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir.), cert. denied sub nom., Reynolds v. von Bulow, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). In von Bulow, the court held that the individual claiming the privilege must demonstrate, through competent evidence, the intent to use the material in order to disseminate information for the public, and such intent must have existed at the inception of the newsgathering *855 process. Ibid. In holding the privilege not limited to reporters employed in the traditional print or broadcast media, the court stated that an individual may successfully claim the journalist's privilege if she is involved in activities traditionally associated with the gathering and dissemination of news, even though she may not ordinarily be a member of the institutionalized press. Id. at 144-45. Thus, it makes no difference whether the "intended manner of dissemination [was] by newspaper, magazine, book, public or private broadcast medium, handbill or the like [because] `the press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" Id. at 144 (quoting Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949, 954 (1938)). In focusing on the claimant's intent at the inception of the investigatory process, the Second Circuit contrasted a person who "gathers information for personal reasons, unrelated to dissemination of information to the public, [who] will not be deterred from undertaking his search simply by rules which permit discovery of that information in a later civil proceeding." von Bulow, supra, 811 F.2d at 143. In other words, von Bulow holds that the purpose of the journalist's privilege is not solely to protect newspaper or television reporters, but to protect the activity of investigative reporting. Id. at 142-43.
The test fashioned in the von Bulow decision was adopted by the Court of Appeals from the Ninth Circuit. Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir.1993). In extending the journalist's privilege to investigative book authors, the court reiterated von Bulow's reasoning that the journalist's privilege "is designed to protect investigative reporting, regardless of the medium used to report the news to the public." Ibid. "What makes journalism journalism is not its format but its content." Ibid. Thus, "the critical question for deciding whether a person may invoke the journalist's privilege is whether she is gathering news for dissemination to the public." Ibid.
The von Bulow test was also followed by the Third Circuit in In re Madden, supra, 151 F.3d at 129-30, which found the test consistent with the Supreme Court's concerns (see Lovell, supra, 303 U.S. at 452-53, 58 S.Ct. at 669, 82 L.Ed. at 953-54) "that the privilege apply only to legitimate members of the press." 151 F.3d at 129-30. In Madden, a non-party witness in a civil matter sought the protections of the Pennsylvania Journalist's Shield Law, 42 Pa. Cons.Stat. Ann. § 5942 (West 2009), which granted the privilege to persons connected with any newspaper or magazine of "general circulation" as well as any press association, radio or television station. The witness was an employee of a professional wrestling promoter, whose job was to record prepared commentaries which would be played to callers of an 900-number hotline to promote upcoming wrestling events and pay-per-view television programs, announce results of wrestling matches and discuss wrestlers' personal lives and careers. Id. at 126. The court held the witness was not a journalist because all of his information was given to him by his employers, and "[h]e uncovered no story on his own nor did he independently investigate any of the information given to him" by his employers. Id. at 130. Moreover, he was not gathering or investigating "news," and he had "no intention at the start of his information gathering process to disseminate the information he acquired." Ibid. In rejecting the witness' claim of privilege under Pennsylvania's Shield Law, the Third Circuit reasoned that
[t]his test does not grant status to any person with a manuscript, a web page or *856 a film, but requires an intent at the inception of the newsgathering process to disseminate investigative news to the public. As we see it, the privilege is only available to persons whose purposes are those traditionally inherent to the press; persons gathering news for publication. It is the burden of the party claiming the privilege to establish their right to its protection.
[Id. at 129-30 (internal citations omitted).]
Courts in New Jersey have also applied the "intent" test and have come to different results. Compare In re Venezia, 191 N.J. 259, 271-75, 922 A.2d 1263 (2007) (finding a reporter acts in the course of pursuing his professional activities whenever he obtains information for the purpose of disseminating it to the public), with In re Napp Technologies, Inc., 338 N.J.Super. 176, 191, 768 A.2d 274 (Law Div.2000) (finding no First Amendment privilege in favor of a public relations firm because it had failed to establish an intent to disseminate publicly the information it had gathered).

(iii)
The difficulty in defining who is a "newsperson" for purposes of asserting state statutory Shield Law protections has become even more complicated and intricate as the variety of media has expanded. The Internet poses a particularly perplexing problem in deciding who should qualify for the privilege given its easy accessibility, connectiveness, virtually limitless research capacity and universality. This medium has become a major tool of electronic communication. Instantaneous and inexpensive, the Internet's reach has the potential to extend beyond that of newspapers and other traditional news media.
Simply with a "click of a mouse[,]" the Internet enables any person to do his or her own investigation of a story. Carol J. Toland, Comment, Internet Journalists and the Reporter's Privilege: Providing Protection for Online Periodicals, 57 Kan. L.Rev. 461, 481 (2009). And with the emergence of blogs[7] and bulletin boards as an extremely popular form of personal connection around the globe,[8] the Internet *857 gives people a chance to post their opinions and insights about a wide range of topics, to comment on other people's posts and to get feedback on the information they have already posted. "Any person or organization with a computer connected to the Internet can `publish' information." Reno v. American Civil Liberties Union, 521 U.S. 844, 853, 117 S.Ct. 2329, 2335, 138 L.Ed.2d 874, 886 (1997). As one commentator noted, the "`lonely pamphleteer' is the solo blogger[.]" Anne M. Macrander, Note, Bloggers as Newsmen: Expanding the Testimonial Privilege, 88 B.U.L.Rev. 1075, 1088 (2008).
However, the fact of presenting information on a new, different medium, even if capable of reaching a wider audience more readily, does not make it "news," for purposes of qualifying for the newsperson's privilege. Simply put, new media should not be confused with news media. There is, of necessity, a distinction between, on the one hand, personal diaries, opinions, impressions and expressive writing and, on the other hand, news reporting. The transmission or dissemination of a "message" through the new medium of the Internet, or the display of one's content or comment thereon, does not necessarily entitle the author or writer to the same protection as a "newsperson." Although any attempt at defining "news" would ultimately prove illusory, some delimiting standards must pertain lest anyone with a webpage or who posts materials on the Internet would qualify.

(iv)
With one exception, state courts have yet to address the issue of whether bloggers are journalists. In O'Grady v. Superior Court, supra, 44 Cal.Rptr.3d at 100, the California Court of Appeals interpreted the term "magazine, or other periodical publication" in the state's Shield Law, Cal. Evid.Code § 1070(a) (Deering 2009); Cal. Const., art. 1, § 2, subd. (b), to embrace the claimants' Internet publications. There, the defendant bloggers were the proprietors and authors of Internet-only publications"O'Grady's PowerPage" and "Apple Insider"to whom suspected Apple Computer insiders leaked confidential trade secrets about soon-to-be-released Apple products. Id. at 77-80. When this information was posted on the defendants' respective websites, Apple sued the two Internet publishers and sought, through subpoenas, the identity of their confidential, anonymous sources. Id. at 80-81. In response, the defendants moved for a protective order under California's Shield Law. Id. at 81. The trial court denied the motion, holding that the reporter's privilege did not apply to trade secrets. Id. at 82; see Apple Computer, Inc. v. Doe 1, No. 1-04-CV-032178, slip op. at 7-13, 2005 WL 578641 (Cal Sup.Ct. Mar. 11, 2005). The appellate court reversed, concluding that the activities of "O'Grady's PowerPage" and "Apple Insider" constituted the "gathering and dissemination of news," O'Grady, supra, 44 Cal.Rptr.3d at 97-98, that the publishers were "covered persons," id. at 99-100, and their articles were "covered publications." Id. at 99-105.
In reaching this result, the O'Grady Court found the defendants' websites to be the functional equivalent of printed publications: "they consist predominantly of text on `pages' which the reader `opens,' reads at his own pace, and `closes.'" Id. at 103. The court affirmed that "[n]ews-oriented [websites] like petitioners' are surely `like' a newspaper or magazine for these purposes." Id. at 100. In determining what constitutes an Internet "periodical" and is therefore covered by the Shield Law, the court enumerated the essential characteristics of frequency of publication, quantity of articles published *858 per week, permanency of web address and number of visitors per month. Id. at 97-105.
In this regard, the two publications in O'Grady shared many similar traits concerning their respective purposes, track record for publishing and web traffic. "O'Grady's PowerPage" is "an `online news magazine' devoted to news and information about Apple Macintosh computers and compatible software and hardware." Id. at 77. It "has been published daily since 1995" and "publishes 15 to 20 items per week." Ibid. The site has occupied its present web address since 2002 and "received an average of 300,000 unique visits per month[]" in the two years preceding the case. Ibid. "Apple Insider is an `online news magazine' devoted to Apple Macintosh computers and related products." Ibid. It has published "daily or near-daily technology news" since 1998 and publishes "at an average rate of seven to 15 articles per week." Ibid. The site has occupied its present web address since 1998 and "received 438,000 unique visitors" in July 2004. Ibid. Given that the real goal of California's Shield Law was to protect the process of newsgathering, the court found the blogs at issue to be functionally indistinguishable from traditional print publications and therefore within the privilege's protective cloak. Id. at 105-06.

(v)
Whether we focus on the intent of the claimant in gathering the sought-after information, as in von Bulow, or the claimant's affiliation with a specified type of news entity and the information process itself, as in O'Grady, defendant here simply does not pass the test. The key to the application of the newsperson's privilege is not that one claims to be a reporter or that one has a website, In re Madden, supra, 151 F.3d at 129-30, but that one is actively affiliated with and engaged in any of the "aspects of the news process[.]" Gastman v. N. Jersey Newspapers Co., 254 N.J.Super. 140, 145, 603 A.2d 111 (App.Div.1992) (internal quotations and citations omitted). The dispositive consideration in O'Grady, supra, was the uncontradicted proof that the defendant claimants "gather[ed], select[ed], and prepare[d], for purposes of publication to a mass audience, information about current events of interest and concern to that audience." 44 Cal.Rptr.3d at 106.
We read New Jersey's Shield Law to similarly focus on the news process rather than the medium or mode through which the news is disseminated to the public. Thus, the statutory privilege extends to persons "engaged in, connected with or employed by", N.J.S.A. 2A:84A-21, any medium "similar" to one of several enumerated news entities, N.J.S.A. 2A:84A-21a(a), and involved in any aspect of the news process, including "gather[ing], procur[ing], transmitt[ing], compil[ing], edit[ing,] or disseminat[ing]" regardless of the manner of dissemination, be it print, broadcast, mechanical, electronic or other means. N.J.S.A. 2A:84A-21(a). Moreover, the individual claiming the privilege must be engaged in the news process while his or her requisite relationship or affiliation with the news media is still in effect. N.J.S.A. 2A:84A-21a(b).
The statutory privilege reflects the Legislature's commitment to protect the news media from compulsory testimony, "particularly when such testimony is sought by the State." In re Woodhaven Lumber & Mill Work, 123 N.J. 481, 489, 589 A.2d 135 (1991).[9] As noted, the fundamental interest to be protected is the ability of the news media to maximize "the free flow of information" to the public that *859 might otherwise dry up if a newsperson's source were no longer confidential. Id. at 492, 589 A.2d 135 (quoting In re Schuman, supra, 114 N.J. at 29, 552 A.2d 602). The protective mantle of confidentiality, essential to invocation of the privilege, is established upon an understanding, either express or implied, that the information or its sources will not be disclosed. Where, as here, there is no evidence of any mutual understanding or agreement of confidentiality, the rationale for the privilege ceases to exist. Since New Jersey's Shield Law accords confidentiality to the "source" of news, it stands to reason that a claimant who conceals from the source her professional identity is undeserving of its protection, as application of the statutory privilege in that instance would not further any of its underlying goals, purposes or concerns. In re Venezia, supra, 191 N.J. at 271, 922 A.2d 1263; Trump, supra, 403 N.J.Super. at 303 n. 12, 958 A.2d 85.
It is not enough to simply self-proclaim oneself a journalist. Here, the only evidence in support of defendant's claim that she is a newsperson is her own self-serving characterization and testimony as to her intent in gathering information, which the trial court found not credible[10], a determination to which we defer. See State v. Locurto, 157 N.J. 463, 473-74, 724 A.2d 234 (1999). Defendant has produced no credentials or proof of affiliation with any recognized news entity, nor has she demonstrated adherence to any standard of professional responsibility regulating institutional journalism, such as editing, fact-checking or disclosure of conflicts of interest.
Defendant's only proof that Pornafia qualifies as a news medium is a press release she issued only months before her allegedly defamatory statements appeared on electronic bulletin boards operated by others. The press release publicized that Pornafia was an "information exchange" about fraud in the adult entertainment industry, and its "aim" was to provide "a cost free information resource for victims, potential victims, legitimate industry players, and pertinent government agencies worldwide." However, the statement was vague as to how exactly defendant intended to accomplish Pornafia's goals. Were people simply going to post comments about their experiences, with defendant providing the platform for that "information exchange"? Was defendant going to provide links to other outside sources of information? Did defendant intend to do any "investigative reporting" to provide content for the site?
As to the latter, while defendant listed voluminous articles and posts she read while researching the online porn industry, she produced no notes of conversations, meetings or interviews with contacts or sources or, for that matter, of any investigation independent of the writings of others. In fact, defendant admitted that she never attempted to contact the principals of TMM to ascertain their version of the security breach incident. Nor did she provide any details about any fact-checking on the information she collected. Most significant, defendant never identified herself to any of her so-called sources as a reporter or journalist so as to assure them their identify would remain anonymous and confidential, a key factor in the application of the newsperson's privilege. In re Venezia, supra, 191 N.J. at 271, 922 A.2d 1263.
*860 Moreover, although defendant claimed to have hired writers for the "online magazine" section of Pornafia, she never revealed the identities of any contributors. In fact, she offered no proof that any material, much less of an educational and informational content, was ever published on the website. At best, the evidence reveals defendant was merely assembling the writings and postings of others. She created no independent product of her own nor made a material substantive contribution to the work of others. As the motion judge found, defendant herself admitted that she had never actually published anything in Pornafia, "and thus there is little evidence (other than her own self-serving statement) that [defendant] actually intended to disseminate anything newsworthy to the general public."
While actual publication may not be a prerequisite to application of the newsperson's privilege, In re Schuman, supra, 114 N.J. at 22-27, 552 A.2d 602; Kinsella, supra, 362 N.J.Super. at 152, 827 A.2d 325; Biunno, Current New Jersey Court Rules of Evidence, comment 1 on N.J.R.E. 508 (2009), it is certainly evidential, in these circumstances, of defendant's state of mind at the outset of her "information-gathering" process. And contrary to defendant's argument on appeal, the motion judge made no determination whether defendant's planned publication on Pornafia was "newsworthy." The judge was simply acknowledging that in order to claim the privilege, defendant must prove an intent to publish "news," and that, based on the record evidence and his assessment of defendant's credibility, defendant had not intended any publication of her research.
We do not mean to suggest that one must satisfy all the aforementioned considerations to qualify as a member of the news media. We recognize, for instance, that a person need not be actively engaged in the gathering of news to claim the privilege, as engagement in the mere act of transmitting or compiling information may suffice. Gastman, supra, 254 N.J.Super. at 144-45, 603 A.2d 111. Nor are we deciding what is and what is not news. We consciously avoid the occasion to define these terms, recognizing the difficulty and futility of doing so. Kinsella, supra, 362 N.J.Super. at 154, 827 A.2d 325 (citing Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588, 607-08 (1985)). We hold only that under the admittedly broad language of "news" and "news media" contained in N.J.S.A. 2A:84A-21a(a) and (b), and in view of the totality of the evidence, defendant has exhibited none of the recognized qualities or characteristics traditionally associated with the news process, nor has she demonstrated an established connection or affiliation with any news entity.

(vi)
As for defendant's posts on Oprano, we are of the view they are outside of any news gathering or news dissemination process in which defendant may have been engaged. In re Venezia, supra, 191 N.J. at 272, 922 A.2d 1263. As the motion judge correctly observed, Oprano operated as a "message board," which is "no more than a forum for ... conversation." We agree with his observation:
To extend the newsperson's privilege to such posters would mean anyone with an email address, with no connection to any legitimate news publication, could post anything on the internet and hide behind the Shield Law's protections. Certainly, this was not the intention of the Legislature in passing the statute.
In this regard, we perceive a significant distinction, for present purposes, between an operator of a news-oriented website or "blog," and those who simply and randomly *861 comment on the public forums provided by the site. The O'Grady court differentiated between, on the one hand, "the open and deliberate publication on a news-oriented [website] of news gathered for that purpose by the site's operators" and, on the other hand, "the deposit of information, opinion, or fabrication by a casual visitor to an open forum such as a newsgroup, chat room, bulletin board system, or discussion group." O'Grady, supra, 44 Cal.Rptr.3d at 100. The court went on to observe that "[p]ostings of the latter type, where it involves 'confidential' or otherwise actionable information, may indeed constitute something other than the publication of the news." Ibid.
While Oprano describes itself as the "Wall Street Journal of the Porn Industry" and could arguably be considered "news media" for purposes of the Shield Law, defendant had no control over the operation of the website and made no editorial or journalistic contribution to it by posting her comments. Nor did she represent herself to be a newsperson in her posts. Moreover, her comments were made not in the context of a writer for the online publication, but rather as a commenter in a public forum, where any person who cared to could post a comment. Analogizing to traditional media, Oprano may be a self-described "newspaper," and defendant's comments amount to no more than a letter to the editor commenting on an article published by the "newspaper." At worst, defendant is simply participating in a conversation among users about matters of mutual interest. In either case, defendant's comments on Oprano were not made in the context of any recognized aspect of the news process nor, we conclude, by a "newsperson" in the course of her professional activities.

II
Defendant argues that even though she may not qualify under the Shield Law, she is nevertheless entitled to protect the identity of her sources under the First Amendment. This argument, however, overlooks the fact that the First Amendment underlies the protections of our Shield Law. Senna v. Florimont, 196 N.J. 469, 479-81, 494-96, 958 A.2d 427 (2008); Maressa, supra, 89 N.J. at 184-85, 445 A.2d 376; Biunno, supra, comment 1 on N.J.R.E. 508 (noting that the newsperson's privilege "represents a legislative attempt to buttress the protection for news gathering embodied in the freedom of the press guarantee of the First Amendment"). It may even reasonably be argued that state Shield Laws, like New Jersey's, are substantially more protective than the qualified First Amendment privilege recognized in Branzburg. See Note, Developments in the LawThe Law of Media: II. Protecting the New Media: Application of the Journalist's Privilege to Bloggers, 120 Harv. L.Rev. 996, 997-99, 1001 (2007); see also Biunno, supra, comment 1 to N.J.R.E. 508. Our Shield Law is certainly no less protective. Therefore, we draw no distinction between the privilege afforded newspersons under N.J.S.A. 2A:84A-21 and the First Amendment. We reject defendant's argument that the First Amendment provides an independent basis for avoidance of her obligations under our State's discovery rules.
Defendant's First Amendment claim to keep the identities of her sources secret relies exclusively on our decision in Dendrite Int'l Inc. v. Doe, No. 3, 342 N.J.Super. 134, 148, 775 A.2d 756 (App.Div.2001). We find that case inapposite. Dendrite was a civil defamation action in which a corporation sued a John Doe defendant for posting an anonymous message on an Internet Service Providers' (ISP) bulletin board. Id. at 140, 775 A.2d 756. Through expedited discovery, the plaintiff sought by *862 subpoena to compel a non-party, the ISP Yahoo, to disclose the defendant poster's identity. Ibid. In resolving the discovery issue, we held:
The trial court must consider and decide those applications by striking a balance between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendants.
[Id. at 141, 775 A.2d 756.]
We then established the guidelines to be followed, including a requirement that the plaintiff set forth a prima facie cause of action against the fictitiously-named anonymous defendants. Id. at 141-42, 775 A.2d 756. Defendant now argues that because plaintiffs did not show a prima facie case of defamation against her, she is entitled to protect her sources. We disagree.
Defendant's reliance on Dendrite is misplaced for a number of reasons. First, we limited our decision to "standards to be applied by courts in evaluating applications for discovery of the identity of anonymous users of Internet Service Provider (ISP) message boards." Id. at 140, 775 A.2d 756. Plaintiffs here are not seeking discovery from an ISP, and defendant is not an ISP. The protections of Dendrite have never been extended beyond ISPs. Second, and just as significant, there is no anonymous posting here. Both the poster and the posts have been identified; in fact, defendant used her full name as her Oprano username. Unlike Dendrite, defendant here is attempting to assert the First Amendment rights of anonymous third parties to free speech. "Ordinarily, a litigant may not claim standing to assert the rights of third parties." Jackson v. Dep't of Corr., 335 N.J.Super. 227, 231, 762 A.2d 255 (App.Div.2000), certif. denied, 167 N.J. 630, 772 A.2d 932 (2001). Simply put, the present matter does not involve an individual's right to speak anonymously. Also dissimilar to Dendrite, the poster in this case is a party defendant, who had been notified of plaintiffs' complaint, is herself the subject of the discovery request and has participated fully in the N.J.R.E. 104 hearing. And lastly, plaintiffs have fully identified the statements alleged to be actionable speech, and the motion judge has determined, following a plenary hearing, that plaintiffs' pleadings set forth a recognizable and viable cause of action. See Dendrite, supra, 342 N.J.Super. at 140-41, 775 A.2d 756.

III
On this last point, defendant contends plaintiffs failed to state a cause of action and therefore, the court erred in denying her motion to dismiss under Rule 4:6-2(e). The argument is unpersuasive.
According to defendant, since plaintiffs cannot show pecuniary harm, their only potential cause of action would be one for slander per se, yet the alleged defamatory posts were written and therefore could only be considered libel, which requires a showing of monetary damages. Plaintiffs, on the other hand, maintain that they have not limited their claims to slander per se and that their defamation action should proceed even without a showing of pecuniary loss.
It is axiomatic that in reviewing a complaint under Rule 4:6-2(e), the court's "inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Printing Mart Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989).
However, a reviewing court "searches the complaint in depth and with liberality *863 to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J.Super. 244, 252[, 128 A.2d 281] (App.Div.1957). At this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint. Somers Constr. Co. v. Board of Educ., 198 F.Supp. 732, 734 (D.N.J.1961). For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. Independent Dairy Workers Union v. Milk Drivers Local 680, 23 N.J. 85, 89[, 127 A.2d 869] (1956). The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
[Ibid.]
Stated another way, "[c]ourts should approach motions to dismiss for failure to state a cause of action pursuant to Rule 4:6-2(e) with caution[,]" and they should be granted in "`only the rarest [of] instances.'" Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76, 79, 622 A.2d 1295 (1993) (quoting Printing Mart, supra, 116 N.J. at 772, 563 A.2d 31).
In denying defendant's motion to dismiss, the judge explained the nature of plaintiff's cause of action:
Defendant relies upon a statement that plaintiff was limiting his damages to "presumed damages." However, thereafter, plaintiff's [sic] counsel explained that because plaintiffs allege this is a "defamation per se case," he was not seeking damages for "loss of income" but only damages to plaintiffs' reputation which he planned to prove by multiple witnesses who will testify that they believed defendant's allegations and thought "what miserable people they (plaintiffs) must be." Additionally, the complaint itself never uses the word "slander," it only refers to defendant's comments as "defamatory," for which compensatory and punitive damages are sought.
Quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789, 811 (1974), the judge reasoned that if plaintiffs proved that they suffered an "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering," they could recover, even if there was no evidence of "actual dollar value to the injury." He concluded that "because defendant's message board postings allege that plaintiffs have engaged in criminal conduct and are incompetent with respect to their business practices, the complaint is actionable without proof of pecuniary damages, and therefore defendant's motion to dismiss the complaint is denied."[11]
Libel and slander were distinguished under Restatement (Second) of Torts, § 568 (1977):
(1) Libel consists of the publication of defamatory matter by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words.

*864 (2) Slander consists of the publication of defamatory matter by spoken words, transitory gestures or by any form of communication other than those stated in Subsection (1).
(3) The area of dissemination, the deliberate and premeditated character of its publication and the persistence of the defamation are factors to be considered in determining whether a publication is a libel rather than a slander.
See Ricciardi v. Weber, 350 N.J.Super. 453, 475, 795 A.2d 914 (App.Div.2002) (slander is oral, libel is written), certif. denied, 175 N.J. 433, 815 A.2d 479 (2003). Whether denominated libel or slander,
In order to establish a prima facie case of defamation ... a plaintiff must show that defendant communicated to a third person a false statement about plaintiff that tended to harm plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff.
[McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 312, 751 A.2d 1066 (App.Div.), certif. denied, 166 N.J. 606, 767 A.2d 484 (2000).]
"In deciding whether a statement is defamatory a court must examine three factors: content, verifiability, and context." Ibid. However, "[a]nother component of a statement's defamatory natureand thus an element of a prima facie caseis that plaintiff must have been harmed by the alleged defamation." Id. at 313, 751 A.2d 1066. "Indeed, to survive a defendant's motion for summary judgment, a plaintiff must raise a sufficient question of fact as to actual injury to his or her reputation." Ibid. "For example, a plaintiff must adduce `concrete proof' that third parties lowered their estimation of the plaintiff and that he or she suffered emotional or pecuniary harm as a result." Ibid. (quoting Sisler v. Gannett Co., Inc., 104 N.J. 256, 281, 516 A.2d 1083 (1986)). The court continued:
It is not sufficient that the plaintiff's own feelings were hurt or that he or she suffered embarrassment. Rather, the focus is on the effect of the alleged defamatory statement on third persons, that is, whether they viewed the plaintiff in a lesser light as a result of hearing or reading the offending statement. Thus, there can be no defamation if the recipients of the alleged defamatory statements did not believe them.
[Ibid. (internal citations omitted).]
However, "[t]he need to demonstrate damages is waived when the defamation is oral and can be categorized as slander per se. In such a case, damages are presumed." Ibid. Slander per se exists when one accuses another: "(1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct." Id. at 313-14, 751 A.2d 1066.
Despite the motion judge's intimation to the contrary, Internet postings, if defamatory, are considered libel. In this regard, comment (d) of § 568 of the Restatement (Second) of Torts says:
The publication of defamatory matter by written or printed words constitutes a libel. Common methods of publishing a libel are by newspapers, books, magazines, letters, circulars and petitions. The writing or printing may be made upon paper, parchment, metal, wood, stone or any other substance and may be accomplished by the use of pencil, pen, chalk or a mechanical device such as the printing press, typewriter, or mimeographing machine.... There are, however, other methods of publishing a libel. The wide area of dissemination, the fact that a record of the publication *865 is made with some substantial degree of permanence and the deliberation and premeditation of the defamer are important factors for the court to consider in determining whether a particular communication is to be treated as a libel rather than a slander. The publication of defamatory matter may be made by conduct which by reason of its persistence it may be more appropriate to treat as a libel than a slander.
Although promulgated in 1977 before the Internet age, this standard, in our view, would encompass defendant's allegedly defamatory postings.
Defendant's postings are written words published through a "mechanical device" (the computer) akin to the typewriter. As a general proposition, it may take more aforethought to type an internet posting than it does to blurt out spoken words. Also, unlike spoken words that evaporate, Internet postings have permanence, as the posts can remain on that particular site for an indefinite period and can easily be copied and forwarded. The name "the world wide web" is an indication that unlike spoken words, Internet postings have the widest distribution possibleglobally. While the image of "town crier" standing and speaking on his soapbox has literary appeal, the Internet is more akin to the town crier handing out printed papers.
We further conclude that plaintiff's complaint states a viable cause of action in libel. "A defamatory statement is one that is false and `injurious to the reputation of another' or exposes another person to `hatred, contempt or ridicule' or subjects another to `a loss of the good will and confidence' in which he or she is held by others." Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988) (quoting Leers v. Green, 24 N.J. 239, 251, 131 A.2d 781 (1957)). Considering "the content, form and context" of the allegedly defamatory statements, Senna, supra, 196 N.J. at 500, 958 A.2d 427, defendant's posting are susceptible to an accusatory meaning that plaintiffs engineered the security breach of the NATS database to profit from it illegally at the expense of consumers and physically threatened anyone who exposed their business practices. See generally Decker v. Princeton Packet, Inc., 116 N.J. 418, 561 A.2d 1122 (1989). Such statements unquestionably have the capacity to injure plaintiffs' reputation or subject them to the "loss of good will and confidence" in which they are held by others. Romaine, supra, 109 N.J. at 289, 537 A.2d 284 (internal quotations and citations omitted). Thus, whether the content of defendant's "writings" is actually defamatory must be resolved by the fact finder.
That said, we next consider whether plaintiff's libel cause of action may proceed without a claim for pecuniary damages. To prove libel plaintiffs must show harm to reputation. McLaughlin, supra, 331 N.J.Super. at 313, 751 A.2d 1066. Plaintiffs may do this by showing "`concrete proof' that third parties lowered their estimation of the plaintiff and that he suffered emotional or pecuniary harm as a result." Ibid. (emphasis added). The Supreme Court has noted:
Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course juries must be limited by appropriate instructions and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the [injury]. [Sisler, supra, 104 N.J. at 280, 516 A.2d 1083 (quoting Gertz, supra, 418 *866 U.S. at 349-50, 94 S.Ct. at 3012, 41 L.Ed.2d at 811).]
The Court in Sisler acknowledged that proof of injury to reputation "defies exact measurement[,]" but suggested that a plaintiff should "offer some concrete proof that his reputation has been injured." Id. at 281, 516 A2d 1083. That could be done by showing an existing relationship had been seriously disrupted. Ibid. "Testimony of third parties as to a diminished reputation will also suffice to prove `actual injury.'" Ibid.
In their complaint, plaintiffs explicitly alleged that they had been "extremely damag[ed]" by defendant's defamatory statements. At the N.J.R.E. 104 hearing, plaintiffs' counsel represented that they intended to show harm to reputation. In response to a question posed by the court, counsel clarified, "[A]ll I need to show is... that someone believed it. I don't need to show that we lost `x' dollars." Counsel reiterated that he was limiting damages "[t]o reputation." Later, counsel, in an attempt to distinguish the two, clarified even further, "the actual damagesthere's two types. I can't show monetary. I can show that somebody believed." After citing case law, plaintiffs' attorney indicated that he intended to show emotional harm by showing that third persons viewed plaintiffs in a lesser light as a result of hearing or reading defendant's statements.
While there was no actual showing of loss of reputation, it was sufficient to defeat defendant's motion to dismiss to have simply alleged such damage, as plaintiffs have done here. As opposed to a summary judgment application, on a motion to dismiss for failure to state a claim, a court is not concerned with a plaintiff's ability to prove the allegations contained in his complaint but simply, whether the complaint, when viewed liberally, states the fundament of a cause of action. The lack of specific evidence of damages to plaintiffs' reputation provides no basis for dismissal of plaintiffs' complaint.

IV
Lastly, defendant argues that the judge erred in determining that plaintiffs need not prove actual malice. We conclude it was premature for the judge to have addressed the issue.
After a plaintiff establishes that a defamatory statement was made, he or she must then "prove an additional element of a prima facie case: that the defendant was at fault in publishing the defamation." McLaughlin, supra, 331 N.J.Super. at 314, 751 A.2d 1066.
There are two fault standards. If the plaintiff is a private person, he or she need show only that the defendant was negligent. If, however, the plaintiff is a public figure, he or she need prove that the defendant was motivated by "actual malice"that the defendant either knew the statement was false or recklessly disregarded its falsity.
[Ibid. (internal citations omitted).]
Despite the fact that neither party raised the issue and the court itself twice iterated, "[w]e're not going to go there," the judge nevertheless determined that plaintiffs were not "public officials, nor is the issue, memberships in adult websites, an issue of public concern" and thus, "in order to prove its case, plaintiff[s] need not prove actual-malice." Not only is this holding bereft of any reasoning, it was rendered without notice to the parties or opportunity to be heard. "An appropriate regard for the orderly judicial process requires that parties be given fair opportunity to pass on points critical to their cases." *867 Rivera v. Gerner, 89 N.J. 526, 538, 446 A.2d 508 (1982). It also requires a fully developed record upon which an informed judgment may be rendered. Because these prerequisites were lacking, the court's finding in this regard cannot stand.
Affirmed in part; reversed in part and remanded.
NOTES
[1] NR Media, Inc. v. Too Much Media, LLC, No. 06-cv-03988-JAP-JJH, 2008 WL 544670 (D.N.J.2008).
[2] Defendant's attorney at that time, who was also counsel for NR Media, had prepared a class action complaint against TMM regarding the security breach, which was submitted to federal court in March 2008, but was not accepted for filing.
[3] Defendant first filed motions to dismiss for lack of personal jurisdiction and forum non conveniens, which were denied.
[4] The judge also denied defendant's separate motion to dismiss plaintiffs' complaint under Rule 4:6-2(e).
[5] This statute is incorporated into the evidence rules at N.J.R.E. 508.
[6] N.J.R.E. 508 includes the text of this statute verbatim.
[7] The term "blog" has a "rapidly evolving and currently amorphous meaning." O'Grady v. Superior Court, 139 Cal.App.4th 1423, 44 Cal.Rptr.3d 72, 102 n. 21 (2006). Generally speaking, a "blog" is a Web or Internet log that contains information, typically in the form of dated entries or postings. See Paul S. Gutman, Note, Say What?: Blogging and Employment Law in Conflict, 27 Colum. J.L. Arts, 145, 146 (2003).

Another law journal article described blogging as follows:
Blogging is the act of writing or maintaining a "blog." A web log or simply a blog, a portmanteau of "web" and "log," is a website containing, at a minimum, posted entries often around a particular area of interest and that are typically time-stamped by blogging software. These posts are often, but not necessarily, in reverse chronological order, so that one would have to trace the thread of that topic back to the first posting. Such a website would usually be accessible to any Internet user .... [T]here are blogs of many kinds and addressing many topics.
[Anne Flanagan, Blogging: A Journal Need Not a Journalist Make, 16 Fordham Intell. Prop. Media & Ent. L.J. 395, 396 (2006).]
One court described a "blog" as "an internet website where users interested in a particular topic can post messages for other users interested in the same topic to read and answer if they wish. When users post information on a blog, they often do so using a pseudonym referred to as a `user name.'" Cahill v. John Doe-No. One, 879 A.2d 943, 945 n. 1 (Del.Super.Ct.), rev'd, 884 A.2d 451 (Del.2005).
[8] It is estimated that in 2006, around the time plaintiff's cause of action developed, there were over 60 million blogs on the Internet. Melissa A. Troiano, Comment, The New Journalism? Why Traditional Defamation Laws Should Apply to Internet Blogs, 55 Am. U.L.Rev. 1447, 1448 (2006).
[9] See also N.J.S.A. 2A:84A-21.9.
[10] Specifically, the court found defendant's certification in support of her motion that she was unaware of the individual plaintiffs' residence or domicile to be untrue, and that her certification, including her assertions that she was a member of the news media, was a "sham affidavit[,]" not entitled to credence.
[11] Despite this finding, the judge also stated that even though the Internet postings were written, they were "somewhat comparable to spontaneous oral statements." Based on this reasoning, the judge also said, incorrectly in our view, that Internet postings alleged to be defamatory constitute "defamat[ion] per se" and therefore, plaintiffs' damages need only be "presumed," not actual, to sustain their cause of action.