827 A.2d 325 (2003)
362 N.J. Super. 143
Joseph KINSELLA, Plaintiff-Respondent,
v.
Stuart WELCH, Defendant, and
Nyt Television and The New York Times Company, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 2003.
Decided July 15, 2003.
*328 Peter G. Banta, Hackensack, argued the cause for appellants (Winne, Banta, Hetherington & Basralian, attorneys; Mr. Banta, of counsel and on the brief; Douglas J. Jones, on the brief).
Gerald H. Clark, argued the cause for respondent (Lynch Martin, attorneys; Mr. Clark, of counsel and on the brief).
Thomas J. Cafferty, Somerset, argued the cause for amicus curiae New Jersey Press Association and Reporters Committee for Freedom of the Press (McGimpsey & Cafferty, attorneys; Mr. Cafferty and Arlene M. Turinchak, on the brief).
Before Judges SKILLMAN, CUFF and LEFELT. *326
*327 The opinion of the court was delivered by SKILLMAN, P.J.A.D.
Defendants NYT Television and the New York Times Company appeal, by leave of court, from the parts of an order entered on December 19, 2002, which determined that a videotape of plaintiff's treatment at Jersey Shore Medical Center (Jersey Shore) is not protected by the Newsperson's Privilege, N.J.S.A. 2A:84A-21 to 21.8, commonly known as the Shield Law, and therefore must be produced for examination by plaintiff.
On July 9, 2001, plaintiff was spraying insecticide on the roof of a building owned by defendant Stuart Welch. Plaintiff inhaled some of the insecticide, became dizzy and fell off the roof, sustaining severe injuries. Plaintiff was taken to Jersey Shore for treatment. When he arrived, defendant NYT Television, a division of defendant The New York Times Company (referred to collectively as NYT), was in the emergency room videotaping for a television program called "Trauma: Life in the E.R.," which is shown on The Learning Channel. In the course of that videotaping, NYT made videotape footage of plaintiff.
The day after his admission to Jersey Shore, plaintiff signed a form consenting to this videotaping. There is a dispute concerning the circumstances surrounding the signing of this form. Plaintiff alleges that he was heavily medicated and "in and out of consciousness" at the time. Plaintiff also alleges that the NYT producer who brought the form to him, Amanda Zinoman, said he "would receive better medical treatment and better doctors" if he signed it. Zinoman claims that plaintiff was no longer in intensive care and was lucid when he signed the form. Zinoman also denies telling plaintiff he would receive better medical treatment if he signed the form, but admits she "may have mentioned to [plaintiff] that often times doctors appear to me to pay more attention to patients when they are being filmed."
NYT produced two episodes of "Trauma: Life in the ER" from the videotape footage taken at Jersey Shore. No videotape footage of plaintiff was included in either program.
Plaintiff brought this action against Welch for the personal injuries he suffered as a result of his fall from the roof and against NYT for invading his privacy by videotaping him while he was in the hospital emergency room. Plaintiff subsequently filed an amended complaint which claimed that NYT's videotaping also violated the Wiretapping and Electronic Surveillance and Control Act (Wiretapping Act), N.J.S.A. 2A:156A-1 to-34. In addition, the amended complaint asserted common *329 law fraud, concealment and misrepresentation claims based on NYT's actions in obtaining his consent to the videotaping.
In discovery, plaintiff requested production by NYT of "[a]ny and all photos and videos depicting Joe Kinsella's medical treatment and ... injuries sustained in [his] accident including ... that made in connection with the `Trauma, Life in the ER' TV shows." Plaintiff's request to produce also asked for "[c]opies of any and all photographs, films, video tapes or recordings of any nature whatsoever which defendant may offer into evidence at the trial of this case." NYT objected to production of these videotapes on the ground that they are protected by the Shield Law. Plaintiff then moved for an order compelling production.
The trial court concluded in a written opinion that NYT is part of the "news media" and that its videotaping in the Jersey Shore emergency room for "Trauma, Life in the ER" constituted "news" and therefore the videotape of plaintiff's treatment was subject to the privilege provided by the Shield Law for information obtained in the course of newsgathering. Nevertheless, the court concluded that the privilege does not bar the release of the videotape of plaintiff's treatment because production of that videotape would not require disclosure of "confidential sources or information" and plaintiff's invasion of privacy claim has "constitutional roots" which override the statutory privilege provided by the Shield Law. Accordingly, the court entered an order compelling NYT to produce the videotape of plaintiff's treatment at Jersey Shore. The order also required NYT to produce "any photos or videos [it] intends to offer into evidence [at trial]."
We granted NYT's motion for leave to appeal from this order. We also granted a motion by the New Jersey Press Association and Reporters Committee for Freedom of the Press to participate in the appeal as amicus curiae in support of NYT's position.
NYT and amicus curiae argue that NYT's videotaping in the Jersey Shore emergency room constitutes newsgathering that is protected from disclosure by the Shield Law. They also argue that plaintiff's invasion of privacy claim does not have constitutional roots that override the protections of the Shield Law. In his answering brief, plaintiff argues, as alternative grounds for affirmance, that NYT's videotaping violated the Wiretapping Act and therefore is not protected by the Shield Law. Plaintiff also argues that NYT is precluded by the doctrines of waiver and estoppel from refusing to produce the videotape footage of him.
We conclude that NYT's videotaping in the Jersey Shore emergency room constituted newsgathering and therefore the footage that was not broadcast, including the videotape of plaintiff, is protected from disclosure by the Shield Law. We also conclude that plaintiff's invasion of privacy claim does not have a constitutional foundation that can be invoked to override the protections of the Shield Law and that plaintiff's other arguments in support of affirmance of the order requiring production of the videotape footage of him are clearly without merit. Therefore, we reverse the order requiring NYT to produce the videotape of plaintiff. However, we conclude that the Shield Law does not provide a basis for a media defendant's refusal to comply with the routine discovery obligation to produce for examination any materials, including videotapes, that a party intends to introduce at trial. Therefore, we affirm the order requiring NYT to provide such discovery.

I
The Shield Law provides in pertinent part:

*330 Subject to [N.J.R.E. 530], a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal ... proceeding....
(b) Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
[N.J.S.A. 2A:84A-21(b).]
The Shield Law defines "news" as meaning
any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect.
[N.J.S.A. 2A:84A-21a(b).]
The term "news media" includes "television." N.J.S.A. 2A:84A-21a(a).[1]
N.J.S.A. 2A:84A-21(b), which was added to the Shield Law by a 1977 amendment, L. 1977, c. 253, § 1, "created an `information privilege' covering all information gathered in the scope of professional [newsgathering] activities, whether or not that information was disseminated." In re Schuman, 114 N.J. 14, 22, 552 A.2d 602 (1989). The availability of this privilege does not turn on whether the information was "derived from a confidential source." In re Woodhaven Lumber & Mill Work, 123 N.J. 481, 490, 589 A.2d 135 (1991) (hereafter referred to as Woodhaven).
The breadth of the news media's "information privilege" is illustrated by Woodhaven. In that case, three newspaper photographers were dispatched to the scene of a fire, where they took numerous photographs, some of which were published in the newspaper. The prosecutor subsequently issued subpoenas to the newspaper to produce all its photographs of the fire before a grand jury. The newspaper refused on the ground that its unpublished photographs were "information" that were protected from disclosure by N.J.S.A. 2A:84A-21(b). Id. at 483, 589 A.2d 135. The Court agreed with the newspaper's position and held that the subpoenas should be quashed. Id. at 497-98, 589 A.2d 135. Although the issue presented in the appeal was whether the exception from the protections of the Shield Law for "an eyewitness to `any act involving physical violence or property damage,' N.J.S.A. 2A:84A-21a(h)" applied to the photographers who had taken pictures of the fire, 123 N.J. at 482, 589 A.2d 135, there would have been no need for the Court even to consider this exception unless the unpublished photographs were "information" within the intent of N.J.S.A. 2A:84A-21(b),a point that the State apparently conceded. Moreover, the Court expressly noted that the 1977 amendments to the Shield Law "created an `information privilege' to protect information gathered in the scope of professional [newsgathering] activities whether or not it is disseminated or derived from a confidential source." Id. at 490, 589 A.2d 135.
It is thus clear from the plain language of N.J.S.A. 2A:84A-21(b) and Woodhaven that the trial court erred in concluding that the Shield Law does not apply to NYT's videotape footage of plaintiff in the Jersey Shore emergency room because production of the videotape would not involve *331 disclosure of "confidential sources or information." NYT's "outtakes" of its videotaping at Jersey Shore are entitled to the same protection from production under N.J.S.A. 2A:84A-21(b) as the unpublished photographs of the fire involved in Woodhaven.
We also reject plaintiff's alternative argument that NYT's videotape of him is not protected by the Shield Law because NYT is not part of the "news media" and the show "Trauma: Life in the E.R." is not "news" but rather a form of "entertainment" which plaintiff characterizes as "shock TV." Our courts have broadly construed the terms "news media" and "news." See, e.g., Woodhaven, supra, 123 N.J. at 497-98, 589 A.2d 135 (Shield Law applies to unpublished photographs taken by a news photographer at a fire); Gastman v. N. Jersey Newspapers Co., 254 N.J.Super. 140, 145-46, 603 A.2d 111 (App.Div.1992) (Shield Law applies to letter published anonymously in letters to the editor column); In re Avila, 206 N.J.Super. 61, 66, 501 A.2d 1018 (App.Div.1985) (Shield Law applies to a free twenty-page Spanish language tabloid); In re Burnett, 269 N.J.Super. 493, 500-02, 635 A.2d 1019 (Law Div.1993) (Shield Law applies to information used in preparation of annual insurance rating report issued by industry trade publication). Moreover, the Supreme Court has held that in the absence of a countervailing constitutional right, the privilege from disclosure provided by the Shield Law is "absolute." Maressa v. N.J. Monthly, 89 N.J. 176, 187-89, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L. Ed.2d 169 (1982).
We recognize that the mere fact a videotape is taken for use in a television show does not automatically mean that the videotape producer is part of the "news media." We also recognize that most television shows do not consist of "news." It is clear, however, that "news" is not limited to reports of significant public events. Local television news programs are sometimes dominated by pictures of fires, accident scenes and interviews of crime victims or their families. Even network national news programs frequently broadcast "human interest" stories that may be considered more entertaining than informative. News magazine programs such as "60 Minutes" and "20/20," which present feature stories on topics that range from in-depth examinations of important public issues to interviews of entertainment celebrities, have become a common form of television show. In view of the variety of topics covered by news shows and the shadowy boundary between "news" and "entertainment," the Supreme Court has observed that "courts should be chary of deciding what is and what is not news." Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588, 607-08 (2d Cir.1985) (quoting dissent below by Meskill, J., 723 F.2d 195, 215 (1983)).
Under the broad definition of "news media" and "news" contained in N.J.S.A. 2A:84A-21a(a) and (b), we are satisfied that NYT is part of the news media and that the videotaping of "Trauma: Life in the E.R." constitutes "newsgathering" that is entitled to protection under the Shield Law. This television program shows the operation of a seashore hospital emergency room during the busy summer months. It follows the cases of individual patients from admission to the hospital through treatment and discharge. The program includes commentary by emergency room physicians concerning the operation of an emergency room and the difficult decisions they are confronted with in the course of this medical practice. The physicians sometimes comment on how the injuries they are treating could have been *332 avoided by, for example, motor vehicle occupants wearing seat belts or parents keeping a more watchful eye on their children. The show also shows the patients' injuries, their reactions to the traumas they have experienced, their interactions with the medical staff, and in some instances their return to normal life outside the hospital. Thus, even though the show presents what are primarily human interest stories, it also has educational and public policy aspects. Although some videotapes of patients' injuries and surgical procedures are more graphic than a viewer would be likely to see on a network news magazine program, this does not warrant plaintiff's characterization of the show as "shock TV" or undermine our conclusion that the show presents "news" that is entitled to the "complete and pervasive security against disclosure" provided by the Shield Law. Maressa, supra, 89 N.J. at 188, 445 A.2d 376.

II
We next consider the trial court's conclusion that the videotape of plaintiff's treatment in the Jersey Shore emergency room is not protected from disclosure by the Shield Law because plaintiff's invasion of privacy claim has "constitutional roots." Initially, we question plaintiff's premise that the Shield Law would be inapplicable if his claim against NYT rested on constitutional grounds. State procedural and evidentiary rules may be properly applied in some circumstances even though an action is based on alleged violations of federal constitutional rights. See Johnson v. Fankell, 520 U.S. 911, 919-23, 117 S.Ct. 1800, 1805-07, 138 L.Ed.2d 108, 117-19 (1997); Denari v. Superior Court of Kern County, 215 Cal.App.3d 1488, 264 Cal. Rptr. 261, 264-68 (1989).
However, there is no need to pursue this point because even if the Shield Law would not apply to a constitutional claim, we are satisfied that plaintiff's invasion of privacy claim is solely a common law cause of action. The elements of the tort of invasion of privacy by an unreasonable intrusion upon the seclusion of another are set forth in section 652B of the second Restatement of Torts:
One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.
[Restatement (Second) of Torts § 652B (1977).]
One illustration of this tort provided in the comments to the Restatement is a newspaper reporter taking a plaintiff's picture in a hospital room against her wishes. Restatement (Second) of Torts, § 652B comment b, illustration 1 (1977); see generally, 1 J. Thomas McCarthy, The Rights of Publicity & Privacy §§ 1:20; 5:87 (2d ed. 2000 & Supp.2002).
We recognized the cause of action for invasion of privacy by an unreasonable intrusion upon the seclusion of another in Bisbee v. John C. Conover Agency, Inc., 186 N.J.Super. 335, 339-40, 452 A.2d 689 (App.Div.1982), and our Supreme Court later recognized this tort in Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 94-95, 609 A.2d 11 (1992) and Rumbauskas v. Cantor, 138 N.J. 173, 179-82, 649 A.2d 853 (1994). There is no suggestion in the Restatement comments, Bisbee, Hennessey or Rumbauskas that the common law tort of invasion of privacy has any constitutional foundation.
Plaintiff grounds his claim of a violation of constitutional privacy rights on both the New Jersey and United States Constitutions. Plaintiff's federal constitutional *333 claim must be summarily rejected because it is firmly established that the United States Constitution is directed only at "state action." See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985, 143 L. Ed.2d 130, 143-44 (1999); DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195-96, 109 S.Ct. 998, 1003, 103 L. Ed.2d 249, 258-59 (1989). Plaintiff's invasion of privacy claim is based solely on the conduct of NYT and its employees, who are private actors. Therefore, plaintiff's complaint does not state a federal constitutional claim.
The cases plaintiff relies upon in support of his State constitutional privacy claim also involved solely governmental action. See, e.g., In re Martin, 90 N.J. 295, 316, 447 A.2d 1290 (1982) (holding that provisions of Casino Control Act which require applicants for casino licenses to reveal personal information to casino regulators do not violate state constitutional right to privacy); In re Grady, 85 N.J. 235, 249-50, 426 A.2d 467 (1981) (holding that "the right to be sterilized comes within the privacy rights protected from undue governmental interference by our State Constitution"). Although Hennessey noted the possibility that an employee who was forced by his employer to undergo random urine testing could assert a claim not only for the common law tort of invasion of privacy but also for a violation of constitutional privacy rights, 129 N.J. at 95-96, 609 A.2d 11, the Court declined to reach the issue. Id. at 96-97, 609 A.2d 11. Most significantly, the Court did not suggest that every actionable invasion of the common law right of privacy also would constitute a violation of constitutional privacy rights.
One treatise on the law of privacy has correctly observed:
A crucial distinction between the [constitutional right of privacy and its common law namesake] is that the common law right operates as a control on private behavior, while the constitutional right operates as a control on government. The two rights are necessarily different because our concept of appropriate behavior for private persons and government officials is different.
[McCarthy, supra, § 5.54 (quoting Peter L. Felcher & Edward L. Rubin, Privacy, Publicity & the Portrayal of Real People by the Medica, 88 Yale L.J. 1577, 1584 n. 42 (1979).]
Therefore, even if some private action could provide a basis for invoking the privacy protections of the New Jersey Constitution, there is no reason to constitutionalize the common law cause of action for invasion of privacy. Cf. Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 669 (1986) ("Our Constitution... does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); Maressa, supra, 89 N.J. at 192-93, 445 A.2d 376 (holding that the New Jersey Constitution should not be construed to create a constitutional right to maintain a libel action).

III
The other arguments plaintiff advances regarding NYT's obligation to produce the videotape footage of his treatment at Jersey Shore are clearly without merit and do not warrant extended discussion. R. 2:11-3(e)(1)(E).
The Wiretapping Act provides in relevant part that "any person who ... [p]urposely intercepts ... any ... oral communication ... shall be guilty of a crime of the third degree." N.J.S.A. 2A:156A-3(a). It defines "oral communication" to mean "any oral communication *334 uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." N.J.S.A. 2A:156A-2(b). The Wiretapping Act applies only to audio communications and thus does not cover the video component of a videotape. State v. Diaz, 308 N.J.Super. 504, 510-12, 706 A.2d 264 (App.Div.1998). Moreover, it is not unlawful for "[a] person... to intercept [an] ... oral communication, where ... one of the parties to the communication has given prior consent to such interception." N.J.S.A. 2A:156A-4(d).
Consequently, if the videotape of plaintiff recorded any oral communication between plaintiff and the Jersey Shore medical staff, the Wiretapping Act would not apply because Jersey Shore consented to NYT's videotaping. N.J.S.A. 2A:156A-4(d). If the videotape recorded any oral communications between plaintiff and other persons, such as his family members, the Wiretapping Act would not apply because there is no indication plaintiff or any other person had a reasonable expectation of privacy during their conversations in the hospital. See Hornberger v. Am. Broad. Cos., 351 N.J.Super. 577, 618-27, 799 A.2d 566 (App.Div.2002). The record does not suggest that any of NYT's videotaping was done surreptitiously. In fact, the footage in the two programs produced from the videotaping at Jersey Shore appear to have been taken with hand-held cameras that would have been evident to any person who was being videotaped. Therefore, there is no basis for concluding that NYT violated the Wiretapping Act in videotaping plaintiff and hence no foundation for plaintiff's claim that the videotape is beyond the protection of the Shield Law because it was obtained by criminal conduct.
Plaintiff's estoppel and waiver claims are based on his allegations that NYT's producer, Zinoman, fraudulently induced him to sign the consent form and promised to give him a copy of the footage of his videotaping. However, NYT disputes these allegations, and there has been no finding that plaintiff's consent was fraudulently induced or that NYT promised to give him his videotape footage. Moreover, our courts will find a waiver or other relinquishment of the protections of the Shield Law only in limited circumstances. See Maressa, supra, 89 N.J. at 194, 445 A.2d 376 (holding that "partial disclosure or the assertion of affirmative defenses no longer constitutes a waiver of the Shield Law privilege").

IV
Finally, we consider the part of the order under appeal that requires NYT to produce any "photos or video" that it "intend[s] to offer into evidence [at trial]."
A requirement that a party to litigation produce any object it intends to introduce in evidence at trial for examination by other parties is a routine part of pretrial discovery authorized by the rules of court. See R. 4:10-2(a); 4:18-1(a). These rules were adopted by the Supreme Court under its plenary rule-making authority. N.J. Const., art. VI, § 2, ¶ 3; see State v. Clark, 162 N.J. 201, 205-06, 744 A.2d 109 (2000). The Shield Law was intended solely to protect newsgathering activities by creating a privilege against disclosure of information obtained by the news media. See Schuman, supra, 114 N.J. at 22, 552 A.2d 602. It was not intended to give a news media defendant a strategic advantage in litigation, by withholding evidence it intends to introduce at trial from pretrial discovery. Therefore, if NYT contemplates introducing any part of the videotape of plaintiff or any other outtake of its videotaping at Jersey Shore into evidence at trial, it must produce that videotape before trial. See Coyle v. Estate of *335 Simon, 247 N.J.Super. 277, 282, 588 A.2d 1293 (App.Div.1991) (holding that "where... client expects to use ... communication... [protected by attorney-client privilege] as evidence, ... [t]he privilege is thereby lost, and the communication must be disclosed in discovery"); Aysseh v. Lawn, 186 N.J.Super. 218, 232, 452 A.2d 213 (Ch.Div.1982) (excluding trial testimony of attorney who invoked attorney-client privilege at a deposition "on the ground that there had been a prejudicial frustration of discovery through the failure to waive the privilege at the time of the deposition").
Accordingly, we reverse the order requiring NYT to produce all videotape footage of plaintiff taken at Jersey Shore, but affirm the order requiring NYT to produce any videotape it intends to introduce at trial.
NOTES
[1] The Shield Law is also set forth in the rules of evidence. N.J.R.E. 508.