75 A.3d 1260

IN RE JANUARY 11, 2013 SUBPOENA BY THE GRAND JURY OF UNION COUNTY, NEW JERSEY.

Superior Court of New Jersey
Union County, Criminal Division

Decided April 12, 2013.

*Bruce Rosen* for petitioner (*McCusker, Anselmi, Rosen, & Carvelli, P.C.*, attorneys).

*Robert Vanderstreet* and *Estrella Lopez*, Assistant Union County Prosecutors, for respondent (*Theodore J. Romankow*, Union County Prosecutor, attorney).

CASSIDY, A.J.S.C.

This matter is before the court on Tina Renna's (Renna) motion to quash a grand jury subpoena. Renna was subpoenaed by the Union County Prosecutor's Office to testify before a grand jury to divulge certain information referenced in her organization's blog, "County Watchers."

*Facts & Procedural History*

In the aftermath of Hurricane Sandy, the Union County Prosecutor's office began an investigation into reports that several county employees improperly took county-owned generators for personal use during or after the storm. Renna is the primary writer and editor of a blog entitled "The County Watchers." The blog is contained on the website of the Union County Watchdog Association (UCWA), a nonprofit 501(c)(3) organization, of which Renna is the president. The UCWA is a self-described advocacy group that reports on alleged waste, corruption, and mismanagement in Union County, New Jersey. Renna authored two blog posts on the alleged misuse of county-owned generators by county employees during Hurricane Sandy and also concerning the subsequent Union County Prosecutor's investigation. Specifically, the posts entitled "Generatorgate" stated that Renna is aware of the identity of approximately sixteen county employees who used county generators for personal use in the aftermath of the storm. The Prosecutor's Office, upon learning of the blog posts, sent Renna two letters requesting that she speak with the County's Special Prosecution Unit to discuss the matter with county investigators. When Renna failed to respond, the Prosecutor's Office issued a grand jury subpoena compelling her to testify concerning her knowledge of the improper use of county generators.

Renna seeks to quash the subpoena on the ground that it violates the New Jersey newsperson's privilege contained in *N.J.S.A.* 2A:84A–21 to –21.8, also known as the "newspaperman's privilege" or the "Shield Law." Renna argues that the privilege applies because she is part of a team of correspondents who engage in original news reporting, advocacy, and investigative journalism for the Union County Watchdog Association through their blog, "The County Watchers." Moreover, Renna asserts that since the Association was formed in 2005 she has posted a variety of materials and articles on a regular basis on the blog, generally averaging one story per week, and works an average of ten to twenty hours or more per week as an editor and reporter.

Renna also asserts that together, she and her colleagues have posted more than 1000 news and video broadcasts posts in total. She further certifies that she obtained the information that is the subject of the subpoena in the course of her professional duties as a news reporter and advocate for the Association.

The State subpoenaed Renna on January 11, 2013. Renna filed an order to show cause to quash the subpoena, which was made returnable on January 25, 2013. At oral argument on the order to show cause hearing, this court determined that pursuant to the seminal Supreme Court case, *Too Much Media, LLC v. Hale*, 206 *N.J.* 209, 20 *A.*3d 364 (2011), a plenary hearing was required to determine first, whether Renna had established a prima facie case necessary to sustain the newsperson's privilege contained in the New Jersey Shield Law, *N.J.S.A.* 2A:84A–21, and second, if the privilege applies, to determine whether Renna had waived the privilege under *N.J.S.A.* 2A:84A–29.

A plenary hearing was conducted on February 28 and March 1, 2013. The scope of the hearing was limited to the three statutory factors, "connection to news media; purpose to gather or disseminate news; and a showing that the materials sought were obtained in the course of professional newsgathering activities," *Too Much Media, supra,* 206 *N.J.* at 241–42, 20 *A.*3d 364 (citing *N.J.S.A.* 2A:84A–21.3(a)), as well as the issue of waiver. At the hearing, counsel for Renna, produced Renna as his only witness. In addition, he offered various exhibits, which included blog posts and screen shots of the UCWA website and County Watchers Blog. The State called no witnesses, but instead relied upon a cross-examination of Renna and various exhibits, which included additional blog posts and videos posted on the UCWA website and other blogs. Counsel then presented summations attesting to the significance of the testimony and exhibits.

## Legal Analysis

Under the "newspaperman's privilege" contained in *N.J.S.A.* 2A:84A–21 and *N.J.R.E.* 508:

[A] person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.

a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and

b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.

This statute, also known as the New Jersey Shield Law, provides an absolute privilege which protects journalists from revealing information or sources obtained during professional news gathering. *N.J.S.A.* 2A:84A–21. New Jersey's Shield Law has been described by the New Jersey Supreme Court as among the broadest in the nation. *In re Venezia*, 191 *N.J.* 259, 269, 922 *A.*2d 1263 (2007). Through the Shield law, "it is clear that the legislature has continually acted to establish the strongest possible protection from compulsory testimony for the press." *In re Subpoena Issued to Schuman*, 114 *N.J.* 14, 24, 552 *A.*2d 602 (1989). In protection of the public policy goal of encouraging the free flow of news reporting, the privilege is evidence of the Legislature's findings that "[e]very compelled production chills confidential sources." *State v. Boiardo*, 83 *N.J.* 350, 360, 416 *A.*2d 793 (1980).

The Shield Law defines "news media" as "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." *N.J.S.A.* 2A:84A–21a(a). "News" is further defined as "any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect." *N.J.S.A.* 2A:84A–21a (b).

The seminal case concerning the applicability of the newsperson's privilege contained in the New Jersey Shield Law, *N.J.S.A.* 2A:84A–21, is *Too Much Media, supra*, 206 *N.J.* at 241–42, 20 *A.*3d 364 in which the New Jersey Supreme Court held that any hearing to determine the applicability of the newspaperman's privilege should focus on the three issues outlined in *N.J.S.A.* 2A:84A–21.3. Namely, claimants must make a prima facie showing that (1) they have the requisite connection to news media, (2) they have the necessary purpose to gather or disseminate news, and (3) the materials sought were obtained in the course of professional newsgathering activities. *Ibid.*

In order to understand the Supreme Court's holding in *Too Much Media*, a review of the Appellate Division's prior holding in this case is necessary. The Appellate Division set forth various factors courts should consider in determining whether a claimant can avail himself of the protections of the newsperson's privilege. *Too Much Media, LLC v. Hale*, 413 *N.J.Super.* 135, 142, 993 *A.*2d 845 (App.Div.2010).

In rejecting the intent test employed by the Third Circuit and earlier New Jersey state court decisions, which required a claimant to have an intent at the inception of the newsgathering process to disseminate investigative news to the public, the Appellate Division in *Too Much Media* focused on the newsgathering process of the claimant and whether the medium employed was similar to one of the enumerated entities under *N.J.S.A.* 2A:84A–21a(a). *Id.* at 156, 993 *A.*2d 845. In fashioning factors the court should apply in determining applicability of the privilege, the Appellate Division focused on the underlying goal of protecting the fundamental public interest in the "ability of the news media to maximize the free flow of information to the public that might otherwise dry up if the newsperson's source were no longer confidential." *Id.* at 158, 993 *A.*2d 845. The Appellate Division concluded that courts should consider the totality of the record taking into consideration certain factors which may assist the factfinder in making a determination about the applicability of the

statutory privilege. *Id.* at 158–59, 993 *A.*2d 845. These factors include: an express or implied understanding with the source that the information or sources disclosed will remain confidential, adherence to institutional journalistic standards such as editing, fact-checking, or disclosure of conflicts of interest, whether the claimant contacted key players in order to present all sides of a story, and whether the claimant self-identified as a journalist to sources. *Ibid.* The Appellate Division explained that a claimant need not satisfy each factor, and furthermore that no one factor is dispositive. *Id.* at 160, 993 *A.*2d 845. The court stated, "[w]e do not mean to suggest that one must satisfy all the aforementioned considerations to qualify as a member of the news media." *Ibid.* Specifically, the Appellate Division found that internet message board posts do not qualify for protection because the claimant exhibited none of the recognized qualities or characteristics traditionally associated with the news process, nor had she demonstrated an established connection with any news entity. *Id.* at 160, 993 *A.*2d 845.

The Supreme Court in *Too Much Media* affirmed the Appellate Division's decision to remand the matter back to the trial court. *Too Much Media, supra,* 206 *N.J.* at 243, 20 *A.*3d 364. In addition, the Supreme Court also rejected the intent test, and further clarified that the factors described by the Appellate Division are *not required* for a claimant to seek the protections of the Shield Statute. *Id.* at 238, 20 *A.*3d 364. The Supreme Court focused its discussion of the Appellate Division's factors on the issues of maintaining an understanding of confidentiality with the source, the claimant's adherence to professional standards of journalism, and whether the claimant self-identified to the source as a journalist. In concluding that these factors are not required in an analysis, the Supreme Court provided several reasons. Specifically, with regard to maintaining of an understanding of confidentiality, the court found that this is not required because the privilege belongs to the newsperson and not the source. *Id.* at 238, 20 *A.*3d 364. In addition, the Court cautioned against requiring that claimants adhere to professional standards of journalism,

such as disclosing conflicts of interest or note taking, because industry practices vary widely. *Id.* at 240, 20 *A.*3d 364. Also, the Court clarified that a newsperson is not required to identify themselves as reporters so long as the claimant does not *intentionally conceal* from the source that he is a reporter. *Id.* at 239, 20 *A.*3d 364 (citing *N.J.S.A.* 2A:84A–21a(h)).

The Supreme Court's opinion, however, does not expressly prohibit or foreclose consideration of the Appellate Division factors. Rather the Court seems to suggest that trial courts should focus on the final product, i.e. the medium itself, when evaluating whether the Shield Law applies. In addition, the Supreme Court did not expressly address the other criteria discussed by the Appellate Division, for example contacting key players in order to present all sides of a story. Thus, this court finds that it may consider the factors described by the Appellate Division in totality, keeping in mind the ultimate charge given by the Supreme Court in its analysis. And certainly, the Supreme Court's opinion does not foreclose a trial court from considering the professionalism of the medium, and its similarity to enumerated "news media" in the statute.

## Waiver

It appeared at the inception of this matter, given information contained on Renna's blog, that she may have divulged the information sought by the subpoena to other law enforcement agencies, and hence waived the privilege. Her blog report indicated that she had no faith in the investigation conducted by the Prosecutor's Office and therefore she offered to provide information concerning those individuals who allegedly used these generators to other law enforcement agencies. During cross examination she admitted to contact with the Federal Bureau of Investigation (FBI) and, over objection, provided the name of one individual that she provided to the Bureau.

The courts have made clear that the privilege cannot be selectively invoked. *In re Venezia,* 191 *N.J.* 259, 262, 922 *A.*2d 1263 (2007) (holding claimant, *Bergen Record* reporter, waived the

privilege when he spoke to the Bergen County Prosecutor's Office, and thus could not later seek the privilege to avoid deposition testimony on the same subject matter). Pursuant to the Shield Statute, *N.J.S.A.* 2A:84A–21, and *N.J.R.E.* 530, when a claimant speaks about his conversations with the source to third-parties or otherwise discloses privileged information outside of the news-gathering and reporting process, he or she waives the privilege. *Ibid.* However, the Shield Statute narrows the scope of waiver provided under the Rules of Evidence by expressly providing that, "[p]ublication shall constitute a waiver only as to the specific materials published." *N.J.S.A.* 2A:84A–21.3b. Thus, under the Shield Statute, Renna has waived the privilege only as to the name of the individual that she provided to the Bureau. Therefore, since Renna purports to know the identity of another fifteen individuals involved in the use of generators, the court must continue its analysis to determine whether the privilege applies to her and thus, whether she must disclose these names.

### *Is the County Watchers Blog Considered "News Media"?*

Concerning whether the privilege applies to non-traditional electronic forms of communication, the Supreme Court in *Too Much Media* explained that:

> New Jersey's Shield Law provides broad protection to the news media and is not limited to traditional news outlets like newspapers and magazines. But to ensure that the privilege does not apply to every self-appointed newsperson, the Legislature requires that other means of disseminating news be "similar" to traditional news sources to qualify for the law's coverage.

[*Too Much Media, supra,* 206 *N.J.* at 216, 20 *A.*3d 364.]

A blog is "a type of personal column posted on the Internet. . . . Some blogs are like an individual's diary while others have a focused topic, such as recipes or political news." *Id.* at 219, n. 1, 20 *A.*3d 364 (*quoting* Downing, *Dictionary of Computer and Internet Terms* 48 (10th ed. 2009)). Digital news outlets, particularly blogs, are increasingly present and vital to the delivery of news to the public in our modern internet age. Joshua Rich, *New Media and the News Media: Too Much Media, LLC v. Hale and*

the *Reporter's Privilege in the Digital Age*, 45 *Loy. L.A. Rev.* 963 (2012).

As the Appellate Division commented, in Too Much Media, "[t]he internet poses a particularly perplexing problem in deciding who should qualify for the privilege given its easy accessibility, connectiveness, virtually limitless research capacity and universality." *Too Much Media, supra,* 413 *N.J.Super.* at 153, 993 *A.*2d 845. The Appellate Division further explained a court's duty to engage in a searching review of electronic sources when determining whether they constitute "news media."

> [T]he fact of presenting information on a new, different medium, even if capable of reaching a wider audience more readily, does not make it "news," for the purpose of qualifying for the newspersons privilege. Simply put, *new* media should not be confused with *news* media. There is, of necessity, a distinction between, on the one hand, personal diaries, opinions, impressions and expressive writing and, on the other hand, news reporting. The transmission or dissemination of a "message" through the new medium of the Internet, or the display of one's content or comment thereon, does not necessarily entitle the author or writer to the same protection as a "newsperson."
> [*Id.* at 154–55, 993 *A.*2d 845.]

New Jersey courts have yet to determine, as a matter of law, whether a blog in and of itself meets the prima facie test for the news privilege. In fact, the Supreme Court noted in *Too Much Media* that when it comes to new technology and other non-traditional electronic media, "form alone does not tell us whether a particular method of dissemination qualifies as 'news media' under the statute." *Too Much Media, supra,* 206 *N.J.* at 233, 20 *A.*3d 364. The Court went on to explain that, "although the Shield Law does not limit its application to traditional news sources, it specifically requires that other means of disseminating news be 'similar' to newspapers, magazines, and the like." *Ibid.* Thus, the prima facie factors must be applied on a case-by-case basis. *Ibid.* The Court further noted that a "single blogger might qualify for coverage under the Shield Law provided she met the statute's criteria." *Id.* at 237, 20 *A.*3d 364.

In applying the three statutory factors to non-traditional media outlets, the courts have determined that Internet message boards

and press releases issued by public relations firms do not meet the prima facie test. *Too Much Media, supra,* 206 *N.J.* at 236, 20 *A.*3d 364; *In re Napp Technologies, Inc. Litigation,* 338 *N.J.Super.* 176, 184, 768 *A.*2d 274 (Law Div.2000). The Supreme Court in *Too Much Media* held that the newsperson's privilege does not extend to a self-described journalist who posted comments on an Internet message board because such activities are not sufficiently similar to the traditional types of "news media" enumerated in the statute. *Too Much Media, supra,* 206 *N.J.* at 236, 20 *A.*3d 364. The Court further held that message boards are more akin to letters to an editor, and thus do not demonstrate the requisite connection to the news media as required by the statute since they are little more than forums for conversation. *Ibid.* In *Too Much Media,* the claimant's comments were not protected even though she alleged that she was investigating potential "criminal activity in the online adult entertainment industry." *Id.* at 218, 20 *A.*3d 364.

In addition, in *In re Napp,* the court held that the Shield Law does not protect "a public relations firm hired to manage adverse publicity" because the firm was neither part of the traditional or nontraditional news media nor analogous to freelance news reporters. *In re Napp Technologies, Inc. Litigation, supra,* 338 *N.J.Super.* at 184, 768 *A.*2d 274. In *Napp,* a public relations firm issued two press releases faulting a third-party for a chemical explosion at its client, Napp's, facilities. *Id.* at 181–82, 768 *A.*2d 274. The third-party subpoenaed the firm for records relating to the explosion. *Ibid.* The court found that these documents were not protected by the privilege because the firm did not have the requisite connection to the news media. *Id.* at 184, 768 *A.*2d 274.

Finally in *In re Avila,* 206 *N.J.Super.* 61, 63, 501 *A.*2d 1018 (App.Div.1985), the court held that the Shield Law applies to a free Spanish language tabloid, even though it does not meet the statutory definition of newspaper since its copies are free. However, the fact that the tabloid had a 25,000 weekly readership qualified it for the Shield Law's broad protections. *Id.* at 66, 501

*A.*2d 1018. In *Petition of Burnett,* 269 *N.J.Super.* 493, 501–502, 635 *A.*2d 1019 (Law Div.1993), the court held that the Shield Law applies to information used in preparation of an annual insurance rating report issued by an industry trade publication, even though the report's contents were directed at a targeted subscribership audience.

In applying the statutory factors under the *Too Much Media* standard, counsel for Renna, argues that to qualify for "news media" protections a medium need not be identical to newspaper. He argues that the court should consider the original content and newsworthiness of the posts on the County Watcher's blog. These original stories include "Generatorgate," the County's inability to account for funds spent at an annual summer concert event called "MusicFest," the County's granting of permission for an employee who is also the Union County Democratic Chair to work from home, alleged pension padding when a previously part-time county employee retired three months after becoming a full-time employee, the purchase of an expensive navigation system for county vehicles, which included European driving directions, and the alleged theft of a county owned chain saw by a former freeholder's step-son. He further argues that Renna's writing is similar to Maureen Dowd or Paul Mulshine in that she engages in original investigative journalism. In addition, he asserts that many traditional news media sources, such as Fox News and MSNBC, often demonstrate a political bias, yet they nonetheless fall squarely within the protections of the Shield Law as television news stations.

In addition, counsel argues that the website (Union County Watchdog Association) along with the blog (The County Watchers) provide comprehensive county information, thereby qualifying the blog as a news medium. Specifically, the Union County Watchdog Association's website contains the following features: an interactive map displaying taxes paid by each municipality to the County, freeholder meeting dates, freeholder meeting minutes and agendas, county ordinances and resolutions, a check registry, executive

department budgets, use of county vehicles by county employees, the County bylaws and administrative code, video excerpts from freeholder meetings, and a list of recent lawsuits filed against the County.

Finally, counsel argues that the frequency of Renna's posts, which generally average one per week since 2005, and her method of talking to sources, attending freeholder meetings, and using Open Public Records Act (OPRA) requests, reading agendas, resolutions, and ordinances, asking questions at freeholder meetings, qualifies her a journalist. Moreover, counsel argues that Renna's connection to the news media, aside from the Watchdog blog, is evident from the fact that her original stories have been picked up by the *Star Ledger*, the *Elizabeth Reporter*, and local Worrell syndicated papers. In addition, Renna testified that her website receives 500 to 600 unique IP address hits per day, thus attesting to the wide readership of her blog.

Conversely, the State argues that Renna is not entitled to protection under the Shield Law. They point to the following as evidence that Renna should not be considered a journalist: (1) Renna's use of profanities in her written blog and on videos posted on her site, (2) Renna's failure to publicly identify herself as a journalist, (3) Renna's frequent self-identification as a "watchdog" and "citizen activist," (4) spelling and grammar mistakes contained in the blog, (5) a single instance of plagiarism, (6) Renna's failure to issue corrections or to indicate when content in the blog has been changed or modified, (7) alleged bias from Renna's husband's county employment termination and his subsequent freeholder candidacy, (8) Renna's participation in local politics as a Republican Committee person in Cranford, and finally (9) Renna's failure to disclose such alleged bias to her readers.

Due to the above factors, the State argues that her blog is not sufficiently similar to the enumerated mediums described as "news media" under the statute such as "newspapers, magazines ... wire services, radio, or television" under *N.J.S.A.* 2A:84A–21a(a) to constitute the requisite connection to the news media. For

example, the County Watcher blog fails to adhere to journalistic standards, has frequent editing, spelling, and grammar mistakes, fails to issue corrections before changing content, and fails to disclose alleged bias from Renna's husband's firing as a county employee. Also, they argue Renna acknowledged in her testimony that she does not ask freeholders or county employees to comment or offer explanations that are included in blog posts. In sum, they argue that the blog's general investigatory methods are not as thorough as traditional or professional journalists, and thus the County Watchers bloggers do not adequately investigate issues prior to posting. For example, when questioning Renna about a post she authored criticizing the County for permitting the chair of the Union County Improvement Authority, Charlotte DeFilippo, to work from home and the employee's handicapped parking tags, Renna did not investigate whether Ms. DeFilippo had a medical reason necessitating the handicapped tags and the permission to work from home. Furthermore, they argue that her blog posts often devolve into personal attacks on county elected officials such as Freeholder Daniel Sullivan, Union County Democratic Chair DeFilippo, and the Union County Director of Communications Sebastian D'Elia.

In addition, they argue that Renna and her team of bloggers never referred to themselves as journalists in their blog posts until two days before this court's plenary hearing. In addition, they point to Renna's comment in her posts that she is not a part of the "brotherly sacred pact of journalists," as relevant to whether she may claim the privilege. Also, they argue that Renna's frequent self-identification as a "watchdog" and "citizen activist" in her blog posts is another relevant factor demonstrating that she is not in fact a reporter. Specifically, the State submitted into evidence approximately a dozen posts where Renna referred to herself as a "watchdog," "citizen activist," or otherwise distinguished her work from that of a journalist. As such, the Union County Watchdog Association's mission statement is further evidence that the purpose of the organization and blog is not to disseminate information as journalists. The mission statement as

posted on the organization's website at http://union countywatchdog.51forg (last visited April 8, 2013), begins as follows:

> The UCWA is 501(c) 3 organization working on behalf of the residents and taxpayers of Union County monitoring the activity of County and advocating change to eliminate waste, corruption, and incompetence. The UCWA will act as a vehicle for the public to make their voices heard in the political forum, and to participate in the legislative process, holding elected officials accountable.

The mission statement does not refer to journalism, reporting, or disseminating news as among the UCWA's goals. Thus, the State argues that Renna and her organization do not hold themselves out to the public as journalists.

The State further argues that under the second statutory factor, the Watchdog Association's purpose is not to gather and disseminate news, but rather to advocate for political change and to increase transparency and participation in government. Moreover, the State asserts that the County Watchers Blog is more akin to a public relations entity that functions for the primary purpose of publicizing and raising funds for the UCWA's activities and under *Napp* the privilege should not apply. This purpose, the State argues, is evident from the bias of the blog posts, the fact that the bloggers do not contact county elected officials for comments, Renna's profanity laden/inappropriate outbursts at freeholder meetings, the UCWA's mission statement, and the fact that the blog posts do not distinguish between advocacy, opinion, and reporting. For example, the State cites to a blog post titled "Indictments Are My Endgame," as confirmation by Renna during cross examination that her goal is to have criminal charges filed against county elected officials.

With regard to the third factor, the State points out that Renna has a history of concealing her role as an "investigative journalist," and thereby one cannot conclude that the methods she employed to obtain information about the generators were performed in the course of professional newsgathering activities. Here, they point to a video of Renna visiting the office of the Union County Municipal Alliance. During the visit, she speaks with an employee

of the organization and asks questions about their tax filing status. The entire visit was taped by another individual, apparently secretly. The visit was then posted to the blog in a post entitled "Union County Alliance still hiding behind their closed door," dated August 1, 2012. Again, the State argues her surreptitious methods are clearly in direct contrast to the requirement that her information was obtained as a part of professional newsgathering.

*Findings of Fact and Conclusions of Law*

The first factor a claimant must demonstrate to establish privilege is a requisite connection to the news media. *Too Much Media, supra*, 206 *N.J.* at 241–42, 20 *A.*3d 364. This connection does not require a newsperson "be employed as a journalist for a traditional newspaper or have a direct tie to an established magazine." *Id.* at 230, 20 *A.*3d 364. However, the claimant "must have some nexus, relationship, or connection to 'news media' as that term is defined." *Ibid.* To avail oneself of the privilege, a claimant cannot merely claim to be a reporter or blogger, he or she must be actively affiliated with and engaged in any aspect of the news process. *Gastman v. N. Jersey Newspapers Co.*, 254 *N.J.Super.* 140, 145, 603 *A.*2d 111 (App.Div.1992). Here, the relevant inquiry is whether Renna is connected or employed by an entity that is sufficiently similar to the traditional news media sources enumerated in the Shield Law, *N.J.S.A.* 2A:84A–21(a). *Too Much Media, supra*, 206 *N.J.* at 233, 20 *A.*3d 364.

In reviewing Renna's website, blog, and her numerous blog posts, it is clear that Renna and her two or three other bloggers do in fact author posts about alleged occurrences and issues related to Union County governance and politics not covered by other media sources. As pointed out during argument, most local publications no longer provide in-depth coverage of county news. Local newspapers and on-line publications show a lack of detail on, for example, freeholder meetings and actions taken by county government. Moreover, while the quality of Renna's writing is not akin to that of a print news reporter, or professional blogger such as Matt Drudge of the Drudge Report

or Arianna Huffington of the Huffington Post, the Supreme Court in *Too Much Media* made clear that a claimant need not be a professional to obtain protection under the privilege. While, it is also evident that Renna's posts often devolve into ad hominem attacks characterizing county employees as "psychopaths" and "Nazis," prior to this point, the courts have not limited the protection to claimants who *consistently and exclusively* author newsworthy writings, or only to those who uphold certain journalistic standards in their writing and conduct. *See Too Much Media, supra,* 206 *N.J.* at 240, 20 *A.*3d 364. As stated by the Court:

> Maintaining particular credentials or adhering to professional standards of journalism—like disclosing conflicts of interest or note taking—is also not required by the Shield Law. ... Regardless, the statute mandates a connection to 'news media' and a purpose to gather or disseminate news; it does not limit the privilege to professional journalists who follow certain norms. The Legislature could have chosen that approach but did not. Compare *N.J.S.A.* 2A:84A–21 with N.Y. Civ. Rights Law § 79–h (applying New York's Shield Law only to "professional journalists and newscasters").
>
> [*Ibid.* (Emphasis added.) ]

In addition, the court's interpretation of "news" and "news media" under the newsperson's privilege is broad. *Kinsella v. Welch,* 362 *N.J.Super.* 143, 153, 827 *A.*2d 325 (App.Div.2003). In *In re Avila, supra,* 206 *N.J.Super.* at 63, 501 *A.*2d 1018, a print tabloid publication was "news media." In *Kinsella, supra,* 362 *N.J.Super.* at 153–54, 827 *A.*2d 325, a videotape of a patient being treated at a hospital, filed for the purpose of airing on a reality television program on the Learning Channel, was considered "news" despite the opposition's argument that it was "entertainment" or "shock TV." Thus, no governing case law precludes this court from granting the privilege to a claimant who authors newsworthy posts, while also posting information which is less newsworthy or inartfully drafted.

 The blog and UCWA website's original content includes descriptions of County political activities, descriptions of actions taken at county freeholder meetings, information on pending county ordinances and budgets, information obtained in OPRA requests and court filings against the county, and county hiring

and employment decisions. In addition, specific original newsworthy blog posts included not only "Generatorgate," but an exposé on "Musicfest," allegations of pension padding, and the alleged theft of county property. Thus, these original posts are arguably newsworthy and constitute "news" under the statute. In addition, Renna's methods of talking to sources, attending freeholder meetings, and using Open Public Records Act (OPRA) requests, reading agendas, resolutions, and ordinances, and asking questions at freeholder meetings, is sufficiently similar to the methods used by traditional news media entities enumerated in the governing statute. Finally, the frequency of Renna's posts, which generally average one per week since 2005, the ten to twenty hours of week she spends preparing these stories, in combination with the original newsworthy posts and content contained in the County Watchers Blog and the UCWA website, render Renna's blog and the UCWA website as a whole sufficiently similar to news media. Thus, her actions in connection with the blog and the website demonstrate the necessary connection to the news media.

The second factor requires the claimant to have the necessary purpose to gather or disseminate news. *Too Much Media, supra,* 206 *N.J.* at 241–42, 20 *A.*3d 364. Specifically, the claimant must be connected with the news media for the "purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public." *N.J.S.A.* 2A:84A–21. Since this court has found that the UCWA website and the County Watchers Blog contain a sufficient degree of "news," it is clear from the record submitted to the court and the testimony at the plenary hearing that Renna and the UCWA have the requisite purpose of gathering and disseminating this "news" to the general public. At the plenary hearing Renna testified that her purpose in authoring the County Watchers blog and maintaining the UCWA website is to gather and disseminate news. In addition, Renna certified as follows, "[m]y purpose in operating, and publishing, the website and writing on the County Watchers is, and always has been, to gather and compile and disseminate to members of the public information about Union County Government."

Renna and the other County Watchers bloggers post this content on the UCWA website, which is publicly accessible on the internet. Renna testified that her website receives 500 to 600 unique IP address visitors per day, thus attesting to the wide readership of the County Watchers blog. In addition, the UCWA has an email mailing list from which they circulate the happenings of the organization to an audience of email subscribers. Under the governing case law, the fact that Renna's organization has an official stated purpose of being a citizen watchdog and an advocate for transparency in government, does not preclude this court from finding that the County Watchers blog does not also have the alternate purpose of disseminating news. Being a reporter and citizen watchdog are not mutually exclusive. In addition, the State cites to no cases or governing law which require that a news entity be unbiased in order to meet this second factor. In fact, many national publications such as *The Weekly Standard* (conservative) and *The New Republic* (liberal) have a point of view, yet are considered mainstream publications employing journalists to report on newsworthy events despite their ideological bent. Thus, Renna has established the second statutory factor.

The third and final factor requires that the materials were obtained in the course of professional newsgathering activities. *Too Much Media, supra,* 206 *N.J.* at 241–42, 20 *A.*3d 364. "In the course of pursuing his professional activities" is defined by the Shield Law as:

> any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public, but does not include any situation in which a reporter intentionally conceals from the source the fact that he is a reporter, and does not include any situation in which a reporter is an eyewitness to, or participant in, any act involving physical violence or property damage.
> [*N.J.S.A.* 2A:84A–21a (h).]

Here, since Renna's specific activities and investigatory methods while gathering information for the blog posts at issue concerning the use of county generators by county employees are part of the editorial process and thus are privileged under *Maressa v. N.J. Monthly,* 89 *N.J.* 176, 445 *A.*2d 376 (1982), her specific methods were not part of any inquiry during the plenary hearing. The

Supreme Court also cautioned the trial courts during a plenary hearing from delving into this area. *Too Much Media, supra,* 206 *N.J.* at 242, 20 *A.*3d 364. "Hearings should not devolve into extensive questioning about an author's editorial, writing, or thought processes. Likewise, they should avoid exposing the privileged materials the Shield Law is designed to protect." *Ibid.*

Under *Maressa, supra,* 89 *N.J.* at 202, 445 *A.*2d 376, the Supreme Court held that "the Shield Law affords newspersons complete protection against disclosure of their confidential sources and the editorial processes leading to publication of [the subject matter at issue in the legal proceeding for which the claimant seeks protection under the Shield Law]."

■ Renna, in support of her order to show cause, certified as follows:

> The 'County Watchers' blog is a news and information website, with all the attributes of traditional news media except because it is a non-profit entity; as part of the UCWA, it seeks donations rather than sell advertising ... I obtain the information I publish in the course of my duties as the person who writes, operates and publishes the County Watchers blog.

The State, though referring to one instance where Renna may have concealed her investigation of the Union County Municipal Alliance by hiding a video camera, did not demonstrate that such tactics were used here. It also appears that furtive videotaping was not generally used, and no proof was shown that the blog posts at issue resulted from these sorts of tactics.

Thus, Renna's certification is sufficient to meet that final statutory factor that she obtained materials in the course of professional newsgathering activities.

### Conclusion

Our Supreme Court recognized in *Too Much Media* that the issues presented in this case are evolving due to our ever changing technology. They indicated that the Legislature has the ability, should they wish, to more clearly define the privilege given these changing times.

> The Legislature is free to expand the law's coverage as a matter of policy. In an era of ever-changing technology, with new and rapidly evolving ways of communicating, the Legislature may choose to reconsider who is a newsperson and add new

criteria to the Shield Law. We are not foreclosing that discussion today; we are simply interpreting an existing and far-reaching statute.

[*Too Much Media, supra,* 206 *N.J.* at 242–43, 20 *A.*3d 364.]

In addition, various law review commentaries have also weighed in on this issue and have described the complicated legal analyses which the courts must engage in concerning a claim of privilege for citizen journalists under various state shield statutes. Stephanie B. Turner, *Protecting Citizen Journalists: Why Congress Should Adopt a Broad Federal Shield Law,* 30 *Yale L. & Pol'y Rev.* 503, 508–513 (2012). New Jersey's Shield Law presents similar challenges in analyzing the applicability of the privilege in cases like this one.

Thus, given the parameters outlined by our Supreme Court, and for the reasons set forth in this opinion, Renna qualifies for "newspaperman's privilege" contained in *N.J.S.A.* 2A:84A–21, and as such her motion to quash the grand jury subpoena is granted. It is so ordered.